63 A.3d 175

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. CESAR ALBERT VARGAS, DEFENDANT–APPELLANT, AND CARMELO MARTINEZ, DEFENDANT.

Argued November 5, 2012—Decided March 18, 2013.

*Wayne R. Powell* argued the cause for appellant (*Law Office of Wayne R. Powell,* attorney; *Mr. Powell and Wallace R. Wade,* of counsel; Mr. Wade, on the brief).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

Justice ALBIN delivered the opinion of the Court.

We must decide whether the community-caretaking doctrine authorizes the police to conduct a warrantless entry and search of a home to check on the welfare of a resident in the absence of the resident's consent or an objectively reasonable basis to believe that there is an emergency.

In this case, a landlord called the police because he had not seen or been able to contact a tenant for two weeks. During the two-week period, the tenant's garbage was not placed curbside, his mail accumulated, his car remained unmoved, and his monthly rent went unpaid. The landlord expressed concern for the tenant's well-being, and the police entered the home without a warrant and conducted a "welfare check." The tenant was not at home, but the search uncovered evidence that led to the tenant's indictment.

The trial court suppressed the evidence because the warrantless entry and search were not prompted by an objectively reasonable emergency. The Appellate Division reversed, concluding that the community-caretaking doctrine did not require an exigency to conduct a warrantless search; it only required that the police act reasonably.

We now hold that, based on the United States Supreme Court's and this Court's jurisprudence, the community-caretaking doctrine is not a justification for the warrantless entry and search of a home in the absence of some form of an objectively reasonable emergency. Because the warrantless entry and search in this case violated the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of our State Constitution, we reverse and reinstate the trial court's suppression order.

I.

A state grand jury returned an indictment charging defendant Cesar Albert Vargas with various second-, third-, and fourth-degree crimes involving money laundering, possession with intent to distribute marijuana, unlawful possession of firearms, unlawful

weapons devices, and receiving stolen property.[1] The charges arose from the discovery of contraband during a search of Vargas's apartment. Vargas moved to suppress the evidence on the ground that the police entered and searched his apartment in violation of the warrant requirement.

At a suppression hearing before the Honorable Benjamin C. Telsey, J.S.C., the State called four witnesses to testify. The essential facts are largely undisputed.

## A.

By March 2008, defendant Cesar Albert Vargas had resided for about a year in a second-floor apartment at 1035 East Park Avenue in Vineland. Henry Olaya, the landlord of the four-unit building, testified that Vargas was a "good tenant"—he kept his place clean and "paid his rent on time."

On March 2, Olaya placed a letter in Vargas's mailbox informing him that in three days he and an appraiser would enter his apartment. On March 5, Olaya and the appraiser entered Vargas's apartment; Vargas was not at home. Olaya observed nothing amiss inside the residence.

---

1 Specifically, defendant was charged with second-degree conspiracy to commit money laundering, *N.J.S.A.* 2C:5–2, *N.J.S.A.* 2C:21–25a; second-degree money laundering, *N.J.S.A.* 2C:21–25a, *N.J.S.A.* 2C:2–6; second-degree possession of a controlled dangerous substance with intent to distribute MDA, *N.J.S.A.* 2C:35–5a(1), *N.J.S.A.* 2C:35–5b(2); third-degree possession of marijuana with intent to distribute, *N.J.S.A.* 2C:35–5a(1), *N.J.S.A.* 2C:35–5b(11); third-degree possession of marijuana with intent to distribute within 1000 feet of school property, *N.J.S.A.* 2C:35–7; second-degree unlawful possession of an assault firearm, *N.J.S.A.* 2C:39–5f; two counts of second-degree possession of an assault firearm and shotgun while committing the above mentioned drug offenses, *N.J.S.A.* 2C:39–4.1a; two counts of fourth-degree possession of prohibited weapons devices,·two large capacity ammunition magazines, *N.J.S.A.* 2C:39–3(j); third-degree receiving stolen property, a rifle, *N.J.S.A.* 2C:20–7; third-degree money laundering, *N.J.S.A.* 2C:21–25a; and two counts of second-degree certain persons not to have weapons, *N.J.S.A.* 2C:39–7b(1).

Codefendant Carmelo Martinez was charged in the same indictment with second-degree conspiracy to commit money laundering and second-degree money laundering. He is not involved in this appeal.

Under the terms of Vargas's lease, rent was due by March 1, and any payment received after the fifth day of the month was deemed late. With the rent unpaid as of March 5, Olaya made several attempts to contact Vargas. However, Olaya received no response to knocks on Vargas's door or to voicemails left on Vargas's cell phone. Two tenants in the building told Olaya that they had not seen Vargas for either "several days" or "weeks." The tenants noticed that a bag of trash had been sitting on Vargas's front porch, and, for "several days" or perhaps a "week," Vargas's Jaguar convertible had not been moved.

On March 17, Olaya intended to do spring cleaning at the building. There, he observed Vargas's Jaguar parked beside the house, covered in pollen, its rear tires deflated. Moreover, Vargas's mailbox was full, and Olaya's March 2 letter had not been removed. Olaya knocked on Vargas's door and called his cell phone without any response. Olaya's concern about the unpaid rent now ripened into concern about his tenant's welfare. Olaya decided against entering Vargas's apartment despite the terms of the rental agreement, which provided that the "OWNER may enter ... the premises at any time in case of emergency or suspected abandonment."

Instead, after conferring with the co-owner of the building, Olaya dialed 9-1-1 to alert the police. Before doing so, however, Olaya did not try calling Vargas's emergency contact number or place of employment.[2] Significantly, Olaya did not know details about Vargas's personal life or employment. He did not know the basic pattern of Vargas's "comings and goings," whether or for how long he vacationed, whether he took business trips, or whether he traveled out of town to meet with family.

In all, three Vineland police officers were dispatched to 1035 East Park Avenue for a "welfare check." When Sergeant Louis Carini and Patrolman John Calio arrived, Olaya told them that he had been unable to contact Vargas for approximately two weeks.

---

[2] Olaya had this information from Vargas's completed rental application.

Olaya also explained that tenants had not seen Vargas in that time and that Vargas was behind on his rent and utility bills. The officers observed for themselves that Vargas's mailbox was full, his Jaguar was covered in dust, and the car's tires deflated.

No one answered when the officers knocked on Vargas's door. The officers then peered through a window but saw no one in the apartment. They contacted dispatch and confirmed that no "calls for service"—such as a call for an ambulance or the police—had come from or been directed to Vargas's apartment. The officers did not ask the dispatcher to check whether Vargas had been arrested or hospitalized because such an approach was not consistent with protocol. Olaya—according to Officer Calio—did not tell them that he had Vargas's contact information.[3]

The officers ultimately entered Vargas's apartment because they "had reasons to fear for his safety." Olaya unlocked the apartment door, and the officers began to search the premises for Vargas. The officers checked all the rooms of the apartment, as well as the closets, and found no one home and no signs of foul play. In the living room they saw a six- to eight-inch jar containing vegetation that appeared to be marijuana. Olaya, who had entered the apartment with the officers, opened kitchen cabinet drawers. Inside one drawer "appeared to be two canning jars full of marijuana." An officer standing nearby observed the drawer's contents, and the police then directed everyone to leave the apartment.

The police later secured a warrant to search the apartment.[4]

### B.

The trial court concluded that the police violated the Constitution's warrant requirement and suppressed all evidence seized as a

---

[3] The landlord also did not tell the officers that he had been inside the apartment with an appraiser on March 5.

[4] Among the items seized from the apartment were $47,001 in cash; a shotgun and rifle; ammunition; a clear plastic bag containing white powder; eight glass

result of the unlawful search of Vargas's home. The court specifically rejected the State's argument that the community-caretaking doctrine justified the warrantless search. According to the court, under the community-caretaking doctrine, the police had to meet a two-prong test before a warrantless search of a residence could be undertaken. The police satisfied prong one because the purpose of the entry into Vargas's home was not to uncover evidence of a crime. The police, however, did not satisfy prong two because there was no objectively reasonable basis to believe that Vargas's life or well-being, or the community's safety was in jeopardy. For that reason, the search of Vargas's home did not fall within an exception to the warrant requirement.

The court distinguished the present case from other community-caretaking doctrine cases: *State v. Bogan*, 200 *N.J.* 61, 975 *A.*2d 377 (2009); *State v. Diloreto*, 180 *N.J.* 264, 850 *A.*2d 1226 (2004); *State v. Garbin*, 325 *N.J.Super.* 521, 739 *A.*2d 1016 (App.Div.1999), *certif. denied*, 164 *N.J.* 560, 753 *A.*2d 1153 (2000); and *State v. Navarro*, 310 *N.J.Super.* 104, 708 *A.*2d 416 (App.Div.), *certif. denied*, 156 *N.J.* 382, 718 *A.*2d 1211 (1998). In each of those cases, the court noted, there was "an immediate risk to not only a present individual but an immediate risk to the community at large." Here, the court did not see "a single indicia of evidence" that either Vargas's or the community's safety was at risk. Rather, the evidence was consistent with someone vacationing, traveling on business, or tending to a sick family member. In other words, "[h]e just wasn't there for a couple of weeks and that's it." [5]

## C.

The court denied the State's motion for reconsideration. The court agreed with the State's argument that the elements of the

---

mason jars containing green vegetation; two ballistic vests; a digital scale; and clear plastic bags containing vegetation, seeds, and one white pill.

[5] The court noted that the only thing possibly "out of the ordinary" was the failure of Vargas to place a hold on the delivery of his mail.

community-caretaking doctrine do not require "an emergent situation." Nevertheless, it maintained that the presence of an immediate danger and the urgent need for police action are factors in determining objective reasonableness, and those factors were absent in this case. From the court's perspective, it was not reasonable to conclude that between March 5—the date the landlord entered Vargas's apartment for an appraisal—and March 17—the date the landlord called the police—"something terrible" had happened to Vargas.

The court stated in a supplemental letter that it found further support for its decision in *Ray v. Township of Warren*, 626 *F*.3d 170 (3d Cir.2010). That case held that "[t]he community caretaking doctrine cannot be used to justify warrantless searches of a home." *Id.* at 177. The court reaffirmed its earlier determination that there were no "exigent circumstances" to justify the warrantless search of Vargas's home.

### D.

In an unpublished opinion, the Appellate Division reversed, holding that the police conducted a warrantless search of Vargas's residence in conformance with the community-caretaking doctrine. The panel observed that *Cady v. Dombrowski* described a community-caretaking function as one "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 714–15 (1973). The panel emphasized that the community-caretaking doctrine does not focus " 'on the compelling need for immediate action . . . but instead on the objective reasonableness of the police action in executing their service function,' " (quoting *State v. Kaltner*, 420 *N.J.Super.* 524, 541, 22 *A*.3d 77 (App.Div.2011), *aff'd o.b.*, 210 *N.J.* 114, 41 *A*.3d 736 (2012)). It noted that although the community-caretaking and exigent-circumstances exceptions to the warrant requirement "ha[ve] been used interchangeably," the two are distinct. Under the panel's

approach, for a warrantless search of a home to fall within the community-caretaking exception, the conduct of the police must be " 'unconnected to a criminal investigation and objectively reasonable under the totality of circumstances,' " (quoting *Diloreto, supra,* 180 *N.J.* at 278, 850 *A.*2d 1226).

The panel acknowledged the "split of authority among the federal circuit courts of appeals concerning the applicability of the [community-caretaking] exception" in the context of home searches. It further acknowledged the Third Circuit's holding in *Ray* that the community-caretaking exception "does not apply to searches of residences," (citing *Ray, supra,* 626 *F.*3d at 177). However, the panel stated that the community-caretaking doctrine under our state-law jurisprudence extends to home searches, (citing *Bogan, supra,* 200 *N.J.* at 74–75, 975 *A.*2d 377 and *Kaltner, supra,* 420 *N.J.Super.* at 542–43, 22 *A.*3d 77). The panel concluded that the warrantless search in this case was based on "a legitimate concern for [Vargas's] welfare and divorced from any criminal investigation" and that the actions of the police were objectively reasonable.

We granted Vargas's motion for leave to appeal. *State v. Vargas,* 209 *N.J.* 99, 35 *A.*3d 681 (2012).

## II.

Vargas urges this Court to reverse the Appellate Division on the ground that the community-caretaking doctrine, absent some degree of exigency, cannot serve as the basis for the warrantless entry and search of a home. He argues that the community-caretaking doctrine is a narrow exception to the warrant requirement and does not apply here because the police did not have an "objective basis to believe" that he was in his apartment and "in need of assistance." He claims that the present case stands in contrast to the community-caretaking cases of *Bogan* and *Diloreto,* in which the police acted to ensure the safety of individuals. Last, Vargas criticizes the Appellate Division for not deferring to the trial court's factual findings, which were reached after hearing witness testimony.

The State asks this Court to affirm the Appellate Division's application of the community-caretaking doctrine and to hold that the entry by the police into Vargas's "apartment to conduct a 'welfare check' was reasonable." According to the State, for purposes of the community-caretaking doctrine, "the police did not need to believe that there was an emergency or that defendant, or the public, was faced with imminent harm." Instead, "all the State needed to show was that the officers' decision to enter the apartment to check on defendant's welfare was reasonable." Indeed, the State concedes that the facts in this case would not permit the invocation of either the exigent-circumstances or emergency-aid exceptions to the warrant requirement because no emergency spurred the police into action. It contends that the trial court erred by "superimpos[ing] requirements under emergency aid onto the community-caretaking doctrine." The State considers "illogical" and "legally unsound" the notion that the community-caretaking exception applies only to motor vehicles and not homes, "as the hearing court ruled below by relying on the Third Circuit's decision in *Ray v. Township of Warren.*" The State points to this Court's use of "the community caretaking exception in the home context in *Bogan*" as "sound precedent." Because the police officers acted reasonably while serving in their community-caretaking role, the State believes the officers "satisfied constitutional requirements."

In determining whether the police validly entered and searched Vargas's home without a warrant in the absence of exigent circumstances, we first turn to general principles governing warrantless searches under our Federal and State Constitutions and then to the genesis and application of the community-caretaking doctrine in our jurisprudence.

### III.

#### A.

"The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures" is an essential

guarantee of both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.[6] Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court*, 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.2d* 752, 764 (1972); *accord State v. Frankel*, 179 *N.J.* 586, 611, 847 *A.2d* 561 ("The sanctity of one's home is among our most cherished rights."), *cert. denied*, 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.2d* 128 (2004), *overruled in part by State v. Edmonds*, 211 *N.J.* 117, 131–32, 47 *A.3d* 737 (2012); *State v. Evers*, 175 *N.J.* 355, 384, 815 *A.2d* 432 (2003) ("The privacy interests of the home are entitled to the highest degree of respect and protection in the framework of our constitutional system...."). The warrant requirement protects an individual in his home from official intrusion whether the purpose of the search is to further a criminal investigation or the government's enforcement of an administrative regulation. *Camara v. Mun. Court of San Francisco*, 387 *U.S.* 523, 530, 87 *S.Ct.* 1727, 1732, 18 *L.Ed.2d* 930, 936 (1967) ("It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.").

 Our constitutional jurisprudence has expressed an explicit preference that government officials first secure a warrant "before executing a search, particularly of a home." *Frankel, supra*, 179 *N.J.* at 597–98, 847 *A.2d* 561; *accord Johnson v. United States*, 333 *U.S.* 10, 14, 68 *S.Ct.* 367, 369, 92 *L.Ed.* 436, 440 (1948) ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not

---

[6] The Fourth Amendment and Article I, Paragraph 7 use virtually identical language. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

> [*U.S. Const.* amend. IV; *see also N.J. Const.* art. I, ¶ 7.]

by a policeman or Government enforcement agent."). Because a warrantless search of a home is presumptively invalid, the State bears the burden of establishing that such a search falls within one of the few " 'well-delineated exceptions' to the warrant requirement." *Frankel, supra,* 179 *N.J.* at 598, 847 *A.*2d 561 (quoting *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978)). Perhaps the most basic rationale for those "well-delineated exceptions" is "the recognition that under certain exigent circumstances" warrantless searches are "both reasonable and necessary." *Frankel, supra,* 179 *N.J.* at 598, 847 *A.*2d 561.

In this case, the State relies on the community-caretaking doctrine to justify the warrantless entry and search of Vargas's home. We now turn to the origins and application of that doctrine.

### B.

Our State and other jurisdictions look to *Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 714–15, as the origin of the community-caretaking doctrine as an exception to the warrant requirement. *See, e.g., State v. Hill,* 115 *N.J.* 169, 174, 557 *A.*2d 322 (1989) ("The [community-caretaking] exception was first recognized by the United States Supreme Court in *Cady v. Dombrowski . . . ."); Ray, supra,* 626 *F.*3d at 174 (same). A careful reading of *Cady,* however, raises the question of whether the United States Supreme Court intended to create a new stand-alone warrant exception. To understand the development of the community-caretaking doctrine and whether it has become untethered from its initial moorings, we begin by examining *Cady.*

The defendant in *Cady,* a Chicago police officer, was involved in an automobile accident in West Bend, Wisconsin and arrested for drunk driving. 413 *U.S.* at 435–36, 93 *S.Ct.* at 2525, 37 *L.Ed.*2d at 711–12. The defendant was injured in the accident and taken to a hospital where he lapsed into a coma; his rental car was towed to a privately owned garage. *Id.* at 436, 93 *S.Ct.* at 2525–26, 37

*L.Ed.*2d at 712. Because the West Bend police had reason to believe that the defendant was carrying his service revolver and because the weapon was not found on his person, an officer conducted a warrantless search of the rental car. *Id.* at 443, 93 *S.Ct.* at 2529, 37 *L.Ed.*2d at 716. The search was conducted in accordance with standard police protocols lest the weapon fall into "untrained or perhaps malicious hands." *Ibid.* Inside the vehicle's trunk, the officer discovered evidence that eventually linked the defendant to a murder. *Id.* at 437, 93 *S.Ct.* at 2526, 37 *L.Ed.*2d at 712.

The United States Supreme Court held that given the immediate need to secure the weapon, the search of the automobile was reasonable under the Fourth Amendment. *Id.* at 448, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718. In reaching that conclusion, the Court focused on the lesser expectation of privacy that an individual has in an automobile, which in turn follows from the complex of state regulations that govern the use of a vehicle on our roadways. *Id.* at 440–41, 93 *S.Ct.* at 2527–28, 37 *L.Ed.*2d at 714. As an underpinning of its decision, the Court highlighted the "constitutional difference between searches" of houses and vehicles, stressing "the ambulatory character of [vehicles]" and the frequency with which the police come in "noncriminal contact with automobiles." *Id.* at 442, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715.

The Court noted that the police often "investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions,* totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715 (emphasis added). That seemingly simple and non-controversial statement to explain, in part, the reasonableness of the police conduct in *Cady* gave birth to the community-caretaking doctrine. *See Hill, supra,* 115 *N.J.* at 174, 557 *A.*2d 322. Ultimately, the warrantless car search passed muster under the Fourth Amendment because the "officer reasonably believed" that a gun could

fall into the hands of vandals unless immediate action was taken. *Cady, supra,* 413 *U.S.* at 448, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718.

Although the Supreme Court in *Cady* recognized law enforcement's "community caretaking functions," it never suggested that community-caretaking responsibilities constituted a wholly new exception to the warrant requirement that would justify the warrantless search of a home.

The United States Supreme Court next referenced "community caretaking functions" in upholding a routine, *warrantless* inventory search of an automobile impounded for parking violations. *South Dakota v. Opperman,* 428 *U.S.* 364, 368, 96 *S.Ct.* 3092, 3097, 49 *L.Ed.*2d 1000, 1005 (1976). The inventory search in *Opperman* was conducted in accordance with standard police procedures. *Id.* at 375–76, 96 *S.Ct.* at 3100, 49 *L.Ed.*2d at 1009. The purpose of the warrantless search was to secure the car's contents for the owner's protection and public safety, not to look for evidence of a crime. *Ibid.* The community-caretaking functions identified in *Opperman* related to the everyday enforcement of motor vehicle laws by police officers. *Id.* at 368, 96 *S.Ct.* at 3096, 49 *L.Ed.*2d at 1004. As in *Cady,* the Supreme Court in *Opperman* was careful to point out the lesser expectation of privacy in motor vehicles: "[a]utomobiles, *unlike homes,* are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *Ibid.* (emphasis added). The Court did not intimate that community-caretaking functions of the police might justify the warrantless search of a home without the presence of consent or probable cause and exigency.

With *Cady* and *Opperman* as a backdrop, the Supreme Court in *Colorado v. Bertine* upheld a warrantless automobile inventory search based on the deference given "to police caretaking procedures designed to secure and protect vehicles and their contents within police custody." 479 *U.S.* 367, 372, 107 *S.Ct.* 738, 741, 93 *L.Ed.*2d 739, 746 (1987) (citations omitted). In *Bertine,* the Court referred to an inventory search—not the community-caretaking doctrine—as "a well-defined exception to the warrant requirement

of the Fourth Amendment." *Id.* at 371, 107 *S.Ct.* at 741, 93 *L.Ed.*2d at 745 (citing *Illinois v. Lafayette,* 462 *U.S.* 640, 643, 103 *S.Ct.* 2605, 2608, 77 *L.Ed.*2d 65, 69 (1983)).

*Cady, Opperman,* and *Bertine* did not carve out community caretaking as an exception to the warrant requirement. Those cases never even referred to a community-caretaking doctrine. All three cases involved permissible inventory searches conducted in accordance with standard police procedures. Additionally, the warrantless automobile search for a loose handgun in *Cady,* arguably, could have been justified under the exigent-circumstances exception. *See, e.g., State v. Minitee,* 210 *N.J.* 307, 322, 44 *A.*3d 1100 (2012) (finding exigent circumstances to conduct warrantless vehicle search for discarded weapon used during armed robbery); *United States v. White,* 607 *F.*2d 203, 208 (7th Cir.1979) (preventing potential danger to police and public constituted exigent circumstances and justified search for missing gun in automobile), *cert. denied,* 449 *U.S.* 1114, 101 *S.Ct.* 926, 66 *L.Ed.*2d 843 (1981).

*Cady* explained, however, that community-caretaking functions performed by police officers may inform an analysis of whether a search or seizure is "reasonable" under the Fourth Amendment— at least in the realm of automobile searches. *Cady, supra,* 413 *U.S.* at 441, 448, 93 *S.Ct.* at 2528, 2531, 37 *L.Ed.*2d at 714–15, 718. The United States Supreme Court has yet to speak of a community-caretaking exception to the warrant requirement, much less one that would allow the warrantless entry of a home absent some exigency. Nevertheless, from phrases lifted from *Cady,* courts have limned the community-caretaking doctrine.

C.

At first, our Court narrowly construed *Cady.* In *State v. Ercolano,* we concluded that although the police were acting in a community-caretaking role in *Cady,* the validity of the warrantless search there was saved by exigent circumstances. 79 *N.J.* 25, 40, 397 *A.*2d 1062 (1979). For some time, we continued to take a

constrained view of *Cady.* In *State v. Hill,* we recognized a community-caretaking exception to the warrant requirement but only in the " 'impounded automobile' context." 115 *N.J.* at 176–78, 557 *A.*2d 322. In *Hill,* we specifically found that the community-caretaking doctrine could not be invoked to justify the warrantless entry into a private residence. *Id.* at 178, 557 *A.*2d 322. Since *Hill,* we have applied the community-caretaking doctrine outside of the automobile-impoundment context. But when we have done so to justify a warrantless entry or search, the factual scenarios involved exigent circumstances—circumstances requiring immediate police action.

*State v. Diloreto* illustrates the cautious manner in which we have applied the community-caretaking doctrine. In *Diloreto,* police officers observed the defendant, apparently asleep in a parked car with the engine running and windows fogged, in an area known for thefts and attempted suicides. 180 *N.J.* at 270–71, 850 *A.*2d 1226. Checking on the driver's welfare, the officers approached the vehicle and asked the defendant to roll the window down and produce identification. *Id.* at 271, 850 *A.*2d 1226. The defendant's name matched that of a missing "endangered" person on a National Crime Information Center alert list. *Ibid.* The defendant was secured in the back of a patrol car for his safety and the officers' protection. *Id.* at 272–73, 850 *A.*2d 1226. A patdown of the defendant uncovered a loaded ammunition clip, which led to the discovery of a gun in the car, which in turn linked him to a murder. *Id.* at 273–74, 850 *A.*2d 1226.

Relying on the community-caretaking doctrine, we upheld the search of the defendant's person in *Diloreto. Id.* at 278, 850 *A.*2d 1226. We found that the officers' actions in checking on the defendant and then securing him were "unconnected to a criminal investigation and objectively reasonable under the totality of circumstances." *Ibid.* We emphasized "that the most significant factor in our analysis (and a factor that should serve to narrow the reach of our holding) is that the police ... were responding to an alert regarding an endangered missing person." *Id.* at 281, 850

*A*.2d 1226. We concluded that the "community caretaker doctrine remains a narrow exception to the warrant requirement." *Id.* at 282, 850 *A*.2d 1226.[7]

We applied the community-caretaking doctrine again in *Bogan* to uphold the constitutionality of a *de minimis* intrusion into a home for the purpose of ensuring the safety of a child potentially in harm's way. 200 *N.J.* 61, 975 *A*.2d 377. In *Bogan*, police officers approached a building where a fourteen-year-old girl claimed she had been sexually molested in a second-floor apartment a short while earlier. *Id.* at 65–66, 975 *A*.2d 377. The victim not only gave a description of the perpetrator, but also told the police that a young boy remained in the apartment. *Id.* at 66, 975 *A*.2d 377. When the police rang the doorbell, a boy appearing to be twelve years old opened the downstairs door. *Ibid.* The boy, clad in pajamas in the middle of a school day, appeared nervous, answered questions inconsistently, and said he was home alone even though the police heard an adult male voice inside the apartment. *Ibid.* The police followed the boy up the landing and asked where his parents were, but did not enter the apartment, even as the boy did so. *Ibid.* The telephone then rang and the boy picked up the receiver, telling the police it was his father. *Id.* at 67, 975 *A*.2d 377. Only after the boy said that the police could speak with his father did one of the officers take several steps into the apartment to hold the receiver. *Ibid.* From that vantage point, the officer observed the defendant who fit the description of the sexual assailant and who was then arrested. *Ibid.*

We recognized in *Bogan* that the police have a community-caretaking role to protect the welfare of a child, especially one

---

[7] *Diloreto* was preceded by two Appellate Division cases that invoked community caretaking in factual scenarios involving exigent circumstances. *See Garbin, supra,* 325 *N.J.Super.* at 524–27, 739 *A*.2d 1016 (upholding constitutionality of warrantless entry of garage from which smoke was coming after report of fire); *Navarro, supra,* 310 *N.J.Super.* at 106–09, 708 *A*.2d 416 (upholding warrantless entry of residence by police in response to "emergency situation"—landlady discovered gun in defendant's apartment in building where children lived and threatened to remove gun herself).

alone and unattended who might be in danger of imminent harm. *Id.* at 75–76, 975 *A.*2d 377. Because the officers' "carefully modulated response" to "swiftly moving events and uncertain circumstances" was "objectively reasonable" under the community-caretaking doctrine, we saw no need to address the applicability of the emergency-aid or exigent-circumstances exceptions to the warrant requirement. *Id.* at 80, 975 *A.*2d 377.

Recently, in *Edmonds*, we articulated limits to the community-caretaking doctrine in the context of a home search. 211 *N.J.* at 143, 47 *A.*3d 737. In that case, the police responded to an unverified call reporting an incident of domestic violence "possibly involving a handgun." *Id.* at 121, 47 *A.*3d 737 (internal quotation marks omitted). After the police entered the home, investigated, and found no evidence of a domestic dispute, we determined that the police had no objectively reasonable basis to conduct a further search of the home. *Id.* at 121–22, 47 *A.*3d 737. We stated that the community-caretaking doctrine is "not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances." *Id.* at 143, 47 *A.*3d 737. That circumspect approach is reflected in *State v. Witczak,* 421 *N.J.Super.* 180, 23 *A.*3d 416 (App.Div.2011). There, the Appellate Division reviewed this Court's community-caretaking jurisprudence and concluded that a warrantless home search is justified only if the police action is objectively reasonable and impelled by "some form of exigency" intended "to ensure the safety and well-being of the citizenry at large." *Id.* at 196–97, 23 *A.*3d 416.

Moreover, last term, in affirming *Kaltner, supra,* 420 *N.J.Super.* at 524, 22 *A.*3d 77, we rejected "an expansive interpretation of the community-caretaking doctrine to justify a warrantless search of a home." *Edmonds, supra,* 211 *N.J.* at 143, 47 *A.*3d 737. In *Kaltner,* as a result of a noise complaint, the police responded at 2:15 a.m. to a residence that was rented by the defendant and fellow college students. 420 *N.J.Super.* at 529, 22 *A.*3d 77. A large party was in progress, and "loud noise was emanating from the home." *Id.* at 529–30, 22 *A.*3d 77. An "unidentified male"

allowed the police officers entry into the home. *Id.* at 530, 22 *A.*3d 77. The police confronted " 'a sea of people' " drinking beer, some of whom were intoxicated, and attempted "to locate the responsible residents." *Ibid.* The Appellate Division found the warrantless entry to be consensual. *Id.* at 536, 22 *A.*3d 77. However, the appellate panel concluded that the police action afterwards— "fanning out and conducting, in essence, a full-blown search"— could not be justified under any exception to the warrant requirement, including the community-caretaking doctrine. *Id.* at 544, 22 *A.*3d 77.

Although we affirmed the Appellate Division in *Kaltner,* we now expressly disapprove of language suggesting that the community-caretaking doctrine permits the warrantless entry into or search of a home in the absence of some form of exigent circumstances. *See id.* at 541, 22 *A.*3d 77 ("[T]he relevant question in community caretaking situations focuses not on the compelling need for immediate action . . . but instead on the objective reasonableness of the police action in executing their service function.").

 Having examined the origins and rationale of the community-caretaking doctrine, and with a keen understanding of the historical protections afforded to the home, we decline the State's invitation to expand the doctrine in a way that was never conceived by the United States Supreme Court. Without the presence of consent or some species of exigent circumstances, the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home.

D.

The breadth of the community-caretaking doctrine has been the subject of much discussion. The United States Courts of Appeals have split on whether the community-caretaking doctrine can justify a warrantless search of a home. In *Ray v. Township of Warren,* the Third Circuit declined to expand the holding of *Cady* to include the warrantless search of a home under the community-caretaking doctrine. 626 *F.*3d at 177. The Third Circuit con-

strued "the Supreme Court's decision in *Cady* as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes" and therefore concluded that the "community caretaking doctrine cannot be used to justify warrantless searches of a home." *Ibid.* In doing so, the Third Circuit joined the Seventh, Ninth, and Tenth Circuits in holding that the community-caretaking doctrine does not apply to the search of a home or commercial building. *Ibid.; United States v. Bute,* 43 *F.*3d 531, 535 (10th Cir.1994) (refusing to extend community-caretaking exception to warrantless search of commercial building because "the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches" (citations omitted)); *United States v. Erickson,* 991 *F.*2d 529, 531 (9th Cir.1993) ("The fact that a police officer is performing a community caretaking function [ ] cannot itself justify a warrantless search of a private residence."); *United States v. Pichany,* 687 *F.*2d 204, 206–09 (7th Cir.1982) (rejecting argument that community-caretaking exception justified warrantless search of unlocked warehouse and finding *Cady* only applies to automobile searches).

Other circuit courts, under the banner of the community-caretaking doctrine, have upheld a warrantless entry or search of a home when a seeming emergency is at hand, *United States v. Quezada,* 448 *F.*3d 1005, 1007 (8th Cir.2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." (citations omitted)), and when a home is the source of an ongoing nuisance, *United States v. Rohrig,* 98 *F.*3d 1506, 1521–22 (6th Cir.1996) ("[T]he governmental interest in immediately abating an ongoing nuisance by quelling loud and disruptive noise in a residential neighborhood is sufficiently compelling to justify warrantless intrusions under some circumstances." (citations omitted)).

Exigent circumstances purportedly inform the application of the community-caretaking doctrine in *Quezada* and, to some extent, in

*Rohrig*—a nuisance case that falls into a category of its own.[8] We do not consider the federal cases from either side of the divide to be necessarily inconsistent with the approach we take here. No circuit court suggests that the warrantless entry of a home is permissible in the absence of some form of exigency.

## IV.

## A.

The present case comes before us because our state case law has blurred the distinction between the community-caretaking and emergency-aid doctrines. We now must bring clarity to our jurisprudence.

■ No one disputes that police officers acting in a community-caretaking capacity "provide 'a wide range of social services' outside of their traditional law enforcement and criminal investigatory roles." *Edmonds, supra,* 211 *N.J.* at 141, 47 *A.*3d 737 (quoting *Bogan, supra,* 200 *N.J.* at 73, 975 *A.*2d 377). In performing community-caretaking tasks, however, police officers must still comply with the dictates of the Fourth Amendment and Article I, Paragraph 7 of our State Constitution.

■■ Police officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement. *See Frankel, supra,* 179 *N.J.* at 598–99, 847 *A.*2d 561. Under the emergency-aid doctrine, a police officer can enter a home without a warrant if he has " 'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury' " and there is a " 'reasonable nexus between the emergency and the area or places to be searched.' " *Edmonds, supra,* 211 *N.J.* at 132, 47 *A.*3d

---

[8] We do not have to decide in this case whether, and under what circumstances, the police would be justified in engaging in a nonconsensual warrantless entry of a residence to abate an ongoing nuisance that is disturbing a neighborhood.

737 (quoting *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561). In other words, "if police officers 'possess an objectively reasonable basis to believe' that prompt action is needed to meet an imminent danger, then neither the Fourth Amendment nor Article I, Paragraph 7 demand that the officers 'delay potential lifesaving measures while critical and precious time is expended obtaining a warrant.' " *Id.* at 133, 47 *A.*3d 737 (quoting *Frankel, supra,* 179 *N.J.* at 599, 847 *A.*2d 561). Indeed, the rationale of the emergency-aid exception is informed in large measure by the community-caretaking responsibilities of government officials, as explained by Judge (later Chief Justice) Burger in *Wayne v. United States:*

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.
>
> [318 *F.*2d 205, 212 (D.C.Cir.), *cert. denied,* 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963).]

Thus, our constitutional jurisprudence recognizes that police officers or first responders, in carrying out their community-caretaking responsibilities, may not have time to secure "a warrant when emergent circumstances arise and an immediate search is required to preserve life or property." *Edmonds, supra,* 211 *N.J.* at 141, 47 *A.*3d 737.[9]

### B.

We cannot unmoor the community-caretaking doctrine from its origins in *Cady.* Neither *Cady* nor its United States Supreme

---

[9] The emergency-aid doctrine is not the only constitutionally permissible basis for police to conduct a warrantless entry of a home. For example, exigent circumstances—in appropriate circumstances—may also justify a warrantless entry and search to prevent the imminent destruction of vital evidence in a criminal investigation. *State v. Henry,* 133 *N.J.* 104, 120, 627 *A.*2d 125 (citing *State v. Hutchins,* 116 *N.J.* 457, 464, 561 *A.*2d 1142 (1989)), *cert. denied,* 510 *U.S.* 984, 114 *S.Ct.* 486, 126 *L.Ed.*2d 436 (1993). Moreover, the hot pursuit doctrine permits the police to enter a dwelling to apprehend a fleeing felon. *Warden, Maryland Penitentiary v. Hayden,* 387 *U.S.* 294, 298–99, 87 *S.Ct.* 1642, 1645–46, 18 *L.Ed.*2d 782, 787 (1967).

Court progeny even remotely suggests that the community-care-taking doctrine was intended as an independent basis for a warrantless entry and search of a home. We reject the State's position that the community-caretaking doctrine, standing alone and in the absence of some form of exigent circumstances, allows the police to conduct warrantless searches of homes. To accept the State's argument would render the emergency-aid doctrine obsolete and undermine the heightened protections afforded to the home under our Federal and State Constitutions.[10]

As discussed earlier, "warrants are generally required to search a person's home ... unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey, supra,* 437 *U.S.* at 393–94, 98 *S.Ct.* at 2414, 57 *L.Ed.*2d at 301 (citations omitted). The warrantless search of a home, even in a homicide investigation, will violate the Fourth Amendment if it is not "justified by any emergency threatening life or limb," *id.* at 393, 98 *S.Ct.* at 2413–14, 57 *L.Ed.*2d at 300, or the destruction of evidence, *Henry, supra,* 133 *N.J.* at 120, 627 *A.*2d 125 (citing *Hutchins, supra,* 116 *N.J.* at 464, 561 *A.*2d 1142). Moreover, merely because police activities are "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715, does not mean that persons have a lesser expectation of privacy in their homes,

---

[10] In support of its position, the State cites *People v. Ray,* 21 *Cal.*4th 464, 88 *Cal.Rptr.*2d 1, 981 *P.*2d 928, 938 (1999), *cert. denied,* 528 *U.S.* 1187, 120 *S.Ct.* 1240, 146 *L.Ed.*2d 99 (2000). In that case, the California Supreme Court sanctions the warrantless entry into a home, without facts that "establish[ ] exigent circumstances or the apparent need to render emergency aid," so long as the police believe the situation "warrant[s] further inquiry to resolve the possibility someone inside require[s] assistance or property need[s] protection." *Ibid.* Notably, the dissent in *People v. Ray* explained that the majority "obscured the firm line at the entrance to the house that the Fourth Amendment has drawn." *Id.,* 88 *Cal.Rptr.*2d 1, 981 *P.*2d at 944 (Mosk, J., dissenting) (internal quotation marks and citations omitted). We believe that the dissent has the better of the argument, and, in any event, *Ray* is at odds with our jurisprudence.

see *Camara, supra*, 387 *U.S.* at 534, 87 *S.Ct.* at 1733, 18 *L.Ed.*2d at 938 (concluding administrative searches constituted "significant intrusions upon the interests protected by the Fourth Amendment").

 Under our state law jurisprudence—outside of the car-impoundment context—warrantless searches justified in the name of the community-caretaking doctrine have involved some form of exigent or emergent circumstances. *See Bogan, supra*, 200 *N.J.* 61, 975 *A.2d* 377; *Diloreto, supra*, 180 *N.J.* 264, 850 *A.2d* 1226; *Garbin, supra*, 325 *N.J.Super.* 521, 739 *A.2d* 1016; *Navarro, supra*, 310 *N.J.Super.* 104, 708 *A.2d* 416. In this case, before the police officers could enter or search Vargas's home without a warrant they had to have " 'an objectively reasonable basis to believe that an emergency require[d]' " immediate action to protect life or prevent serious injury. *Edmonds, supra*, 211 *N.J.* at 132, 47 *A.3d* 737 (quoting *Frankel, supra*, 179 *N.J.* at 600, 847 *A.2d* 561).[11]

We now apply these principles to the case before us.

## V.

 Our standard of review requires that we defer to the trial court's factual findings on a motion to suppress. *See State v. Elders*, 192 *N.J.* 224, 243–44, 927 *A.2d* 1250 (2007) (quoting *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.2d* 809 (1964)) ("An appellate

---

11 Our decision does not—as suggested by the dissent—"change" our law; it merely reaffirms well-established jurisprudence under the Fourth Amendment and Article I, Paragraph 7 of our State Constitution. The dissent does not point to a single United States Supreme Court, New Jersey Supreme Court, or Appellate Division case that allowed the police, absent consent, to forcibly enter a home without having a reasonable basis to believe that an emergency was at hand. The dissent's formulation would permit the police to enter a home whenever it is "objectively reasonable" without the presence of any form of exigency. However, our jurisprudence holds that, without some form of exigency, a nonconsensual entry into a home by the police is objectively unreasonable. The dissent's approach would erode traditional, fundamental protections afforded to the home from government intrusion.

court 'should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.' ") We need not defer, however, to a trial or appellate court's interpretation of the law. *See State v. Gandhi*, 201 *N.J.* 161, 176, 989 *A.2d* 256 (2010). Legal issues are reviewed de novo. *Ibid.*

Here the essential facts are basically undisputed. Defendant Vargas lived in a rental unit owned by Olaya, who was unable to contact him at home or on his cell phone for approximately two weeks. During this period, Vargas made no rent payment. On March 5, the landlord entered Vargas's residence—for appraisal purposes—and did not find Vargas there or anything amiss. On March 17, Olaya called the police to express concern about his tenant. Whatever legitimate worries Olaya had about Vargas's welfare before dialing 9–1–1, he did not attempt to call Vargas's emergency contact number or place of business or enter the apartment under the terms of the rental agreement. Indeed, Olaya did not know any of the personal details of the rhythms of Vargas's life, including whether and for how long he either vacationed, took business trips, or traveled to meet with family.

In that regard, this is unlike the case of a close family member whose housebound elderly relative is not responding to telephone calls and knocks on the door. Nor is this like the case of a diabetic or infirm neighbor who is not seen carrying out routine daily activities and who is not answering the door or the telephone. We need not describe the myriad circumstances that might give rise to an objectively reasonable basis to believe that an emergency requires immediate action for the safety or welfare of another. Suffice it to say, those objectively reasonable circumstances were not found to be present here.

Olaya, the landlord, did not live in the building where Vargas resided. The police officers who responded to his call learned only that Vargas had not been seen for two weeks and, during that time, Vargas had not picked up his mail, moved his car, or paid his

rent and utility bills. Olaya could not convey anything about Vargas's routines, habits, or vulnerabilities. With this limited information, Olaya unlocked the apartment door, and the officers conducted a "welfare check." Although the police officers entered Vargas's residence without a warrant out of their expressed concern for the tenant's safety, the State concedes that neither the emergency-aid nor the exigent-circumstances exception to the warrant requirement justified the entry or search.

After taking testimony at the suppression hearing, the trial court concluded that the State failed to present evidence that a warrantless search was required because of an immediate risk to the safety of either Vargas or the community. Rather, Vargas's absence for "a couple of weeks" was consistent with a person vacationing, traveling on business, or tending to a personal family matter. Moreover, the court did not consider it reasonable to conclude that "something terrible" had occurred between March 5, when Olaya entered Vargas's apartment and saw nothing amiss, and March 17, when Olaya called the police. Ultimately, the court held that the community-caretaking doctrine standing alone, without exigent circumstances, could not justify the warrantless search of Vargas's apartment and therefore granted the motion to suppress.

We hold that the trial court applied the correct legal standard and that sufficient credible evidence in the record supports its decision. The Appellate Division erred by concluding that the community-caretaking doctrine justified the warrantless search of Vargas's home, even in the absence of a "compelling need for immediate action," (quoting *Kaltner, supra,* 420 *N.J.Super.* at 541, 22 *A.*3d 77).

## VI.

Police officers perform both law enforcement and community-caretaking functions. When they are engaged in either activity, they must conform to the dictates of the Constitution. The right of privacy in the sanctuary of one's home is protected whether a

government officer is acting in a law enforcement or community-caretaking capacity. In upholding a vehicle inventory search, *Cady* acknowledged law enforcement's community-caretaking responsibilities; *Cady* did not sanction a warrantless home entry and search.

The community-caretaking doctrine is "not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances." *Edmonds, supra,* 211 *N.J.* at 143, 47 *A.*3d 737. We do not question the good motives of the police officers in this case. But, based on the findings of the trial court, the police did not have an objectively reasonable basis to believe that an emergency threatening life or limb justified the warrantless entry into Vargas's apartment. As such, the seizure of evidence from Vargas's home violated the Fourth Amendment and Article I, Paragraph 7 of our State Constitution and must be suppressed.

## VII.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the trial court's grant of the motion to suppress. We remand to the trial court for proceedings consistent with this opinion.

Chief Justice RABNER, Justices LaVECCHIA and HOENS, and Judges RODRÍGUEZ and CUFF (both temporarily assigned) join in Justice ALBIN's opinion.

Justice PATTERSON filed a separate, dissenting opinion.

JUSTICE PATTERSON, dissenting.

This case concerns an important law enforcement responsibility: the duty to investigate circumstances in which there may turn out to be a grave emergency, or no emergency at all. Police officers are expected to come to the aid of injured or endangered individuals, making prompt decisions in confusing situations. When a law enforcement officer is asked to check on the welfare of someone

who is reported missing, as was the officer summoned by the landlord here, it may be impossible to determine whether the resident is in danger without entering his or her home. In such a setting, absent clear signs of an emergency, the officer may be unable to satisfy the standard of the emergency-aid doctrine. Immediate law enforcement action, however, may be essential to save lives.

Our law has long recognized the community-caretaking doctrine as a foundation for a warrantless residential search in narrow circumstances, independent of the emergency-aid exception to the warrant requirement. The doctrine had been invoked only when police officers' community-caretaking functions were entirely separate from criminal law enforcement, and their conduct was objectively reasonable in the circumstances that they confronted. *See State v. Edmonds*, 211 *N.J.* 117, 142, 47 *A.3d* 737 (2012); *State v. Bogan*, 200 *N.J.* 61, 73–74, 975 *A.2d* 377 (2009); *State v. Diloreto*, 180 *N.J.* 264, 275–76, 850 *A.2d* 1226 (2004); *State v. Kaltner*, 420 *N.J.Super.* 524, 537–38, 22 *A.3d* 77 (App.Div.2011), *aff'd o.b.*, 210 *N.J.* 114, 41 *A.3d* 736 (2012). The community-caretaking doctrine has served an important purpose within its limited scope.

By requiring "some form of an objectively reasonable emergency," defined as "an objectively reasonable basis to believe that there is an emergency," to justify a warrantless residential search, *ante* at 305, 63 *A.3d* at 177, the majority merges the community-caretaking doctrine into the emergency-aid exception to the warrant requirement. Under this new test, absent an objectively reasonable emergency, police cannot enter premises to check on the welfare of its occupants unless a court issues a search warrant.

With due respect to the majority, I do not consider the constraints that it imposes upon law enforcement necessary to protect against unreasonable search and seizure as required by the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. In my view, today's decision unnecessarily complicates the task of police offi-

cers summoned into situations in which the existence and scope of a danger are initially unclear. Accordingly, I respectfully dissent.

## I.

Our courts have traditionally recognized the community-caretaking doctrine and the emergency-aid exception to the warrant requirement to provide distinct, albeit often overlapping, standards for law enforcement. The community-caretaking doctrine reflects the " 'notion that police serve to ensure the safety and welfare of the citizenry at large.' " *Diloreto, supra,* 180 *N.J.* at 276, 850 *A.*2d 1226 (quoting John F. Decker, *Emergency Circumstances, Police Responses and Fourth Amendment Restrictions,* 89 *J.Crim. L. & Criminology* 433, 445 (1999)). Community-caretaking includes "a wide range of social services, such as aiding those in danger of harm, preserving property, and 'creat[ing] and maintain[ing] a feeling of security in the community.' " *Bogan, supra,* 200 *N.J.* at 73, 975 *A.*2d 377 (alteration in original) (quoting Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 *U. Chi. Legal F.* 261, 272 (1998)).

Our courts have not previously confined the community-caretaking doctrine to circumstances in which the investigating officer has enough information to conclude that there is an ongoing emergency. Instead, the constitutionality of police conduct has been assessed under a strict, but practical, two-part standard. First, as the United States Supreme Court held in *Cady v. Dombrowski,* the officer must be acting in a manner "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 715 (1973); *accord Diloreto, supra,* 180 *N.J.* at 275, 850 *A.*2d 1226. Thus, the traditional community-caretaking standard requires suppression of evidence if law enforcement sought to use a community-caretaking function as a pretext for an investigatory search. *See Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715; *Bogan, supra,* 200 *N.J.* at 77, 975 *A.*2d 377; *Diloreto, supra,* 180 *N.J.* at 275, 280, 850 *A.*2d 1226; *see also*

United States v. Goodrich, 183 F.Supp.2d 135, 144–45 (D.Mass. 2001) (concluding an inventory search of a car "was a pretext for a warrantless investigative initiative" and as such there were no "justifications securing the community caretaking function of the police"). This first factor imposes a high bar.

Second, the doctrine has traditionally required a finding that the officer's conduct was "objectively reasonable under the totality of the circumstances." Diloreto, supra, 180 N.J. at 278, 850 A.2d 1226; accord Bogan, supra, 200 N.J. at 81, 975 A.2d 377. Our courts have sometimes premised that finding upon information available to law enforcement indicating that there is an emergency. See Diloreto, supra, 180 N.J. at 278, 850 A.2d 1226 (observing individual located in running vehicle matched missing "endangered" person on National Crime Information Center alert list); State v. Garbin, 325 N.J.Super. 521, 526–27, 739 A.2d 1016 (App. Div.1999) (remarking officers observed smoke coming from a residence at which a fire had been reported), certif. denied, 164 N.J. 560, 753 A.2d 1153 (2000); State v. Navarro, 310 N.J.Super. 104, 106, 109, 708 A.2d 416 (App.Div.) (commenting landlady reported that she had discovered a gun in apartment), certif. denied, 156 N.J. 382, 718 A.2d 1211 (1998).[12]

---

[12] In the motor vehicle setting, courts have invoked the doctrine to uphold searches when there is a potential for, but no definitive evidence of, an emergency. See State v. Washington, 296 N.J.Super. 569, 572–73, 687 A.2d 343 (App.Div. 1997) (holding that officer had a "reasonably objective basis" under the community-caretaking exception justifying a stop when the driver wove within his lane of travel at an "unconventionally slow speed"); State v. Drummond, 305 N.J.Super. 84, 88, 701 A.2d 958 (App.Div.1997) (finding that a "reasonably objective police officer would have been justified in 'making an inquiry on property and life' when observing a darkened car with no one outside it, parked shortly before midnight next to" a closed car wash); State v. Martinez, 260 N.J.Super. 75, 78, 615 A.2d 279 (App.Div.1992) (holding that community-caretaking doctrine justified a stop of a vehicle moving "in the middle of the night on a residential street at a snail's pace"); State v. Goetaski, 209 N.J.Super. 362, 364–65, 507 A.2d 751 (App.Div.) (concluding police were justified by the community-caretaking doctrine in stopping a car driving slowly in the shoulder of the road with a left-turn indicator flashing), certif. denied, 104 N.J. 458, 517 A.2d 443 (1986).

Courts "balance the nature of the intrusion necessary to handle the perceived threat to the community caretaking concern, the seriousness of the underlying harm to be averted, and the relative importance of the community caretaking concern." *Kaltner, supra*, 420 *N.J.Super.* at 542, 22 *A.*3d 77. Thus, an intrusive search predicated upon a minor community-caretaking concern, such as the noise complaint in *Kaltner*, failed the objectively reasonable test and did not survive constitutional scrutiny. *Id.* at 545, 22 *A.*3d 77; *see also Edmonds, supra*, 211 *N.J.* at 121–22, 47 *A.*3d 737 (holding an "unverified 9–1–1 call reporting 'a domestic dispute possibly involving a handgun'" did not justify an objectively reasonable search under the community-caretaking doctrine because the evidence was insufficient to corroborate domestic violence, and "the parties' safety was not an issue"). In short, our law has long imposed an exacting, but pragmatic, constitutional test upon a search justified under the community-caretaking doctrine.

The emergency-aid exception to the warrant requirement serves a different, albeit often related, purpose. It is "derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." *State v. Frankel*, 179 *N.J.* 586, 598, 847 *A.*2d 561, *cert. denied*, 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004), *overruled in part by Edmonds, supra*, 211 *N.J.* at 132, 47 *A.*3d 737. A warrantless search is justified under the emergency-aid doctrine if the State demonstrates that "(1) the officer had 'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury' and (2) there was a 'reasonable nexus between the emergency and the area or places to be searched.'" *Edmonds, supra*, 211 *N.J.* at 132, 47 *A.*3d 737 (quoting *Frankel, supra*, 179 *N.J.* at 600, 847 *A.*2d 561); *see also Brigham City v. Stuart*, 547 *U.S.* 398, 404–05, 126 *S.Ct.* 1943, 1948, 164 *L.Ed.*2d 650, 658 (2006) (clarifying that reasonableness must be objective).

In this case, the majority holds that the State must prove the existence of "some form of an objectively reasonable emergency" to justify a warrantless residential search. *Ante* at 305, 63 *A.*3d at 177. Under that formulation, no meaningful distinction between the community-caretaking doctrine in the residential setting and the emergency-aid exception can be discerned. The decision effectively eliminates community-caretaking as an independent basis for a warrantless residential search, even when the search is objectively reasonable and "totally divorced from the detection, investigation, or acquisition of evidence" for the prosecution of criminal offenses. *Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715.

I cannot conclude that this change in our law is essential to protect the right against unreasonable search and seizure safeguarded by the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. *See Edmonds, supra,* 211 *N.J.* at 129, 47 *A.*3d 737; *Bogan, supra,* 200 *N.J.* at 72, 975 *A.*2d 377; *Frankel, supra,* 179 *N.J.* at 597–98, 847 *A.*2d 561. The majority's elimination of community-caretaking as a separate basis for a warrantless residential search is not prompted by any decision of the United States Supreme Court construing the Fourth Amendment in this setting. The Supreme Court has yet to decide whether its decision in *Cady* is limited to the context of the vehicular search in which that case arose. As this Court noted in *Edmonds,* the federal circuit courts are divided on the reach of *Cady,* with the Fifth, Sixth and Eighth Circuits applying the community-caretaking doctrine to certain residential searches, and the Third, Seventh, Ninth and Tenth Circuits holding that the doctrine cannot justify the warrantless search of a home. *Edmonds, supra,* 211 *N.J.* at 143–44 & n. 13, 47 *A.*3d 737 (citing *Ray v. Twp. of Warren,* 626 *F.*3d 170, 177 (3d Cir.2010); *United States v. Quezada,* 448 *F.*3d 1005, 1007–08 (8th Cir.2006); *United States v. Rohrig,* 98 *F.*3d 1506, 1521–22 (6th Cir.1996); *United States v. Bute,* 43 *F.*3d 531, 535 (10th Cir.1994); *United States v. Erickson,* 991 *F.*2d 529, 531 (9th Cir.1993);

*United States v. York*, 895 *F*.2d 1026, 1029–30 (5th Cir.1990); *United States v. Pichany*, 687 *F*.2d 204, 207–09 (7th Cir.1982)).[13]

In short, federal jurisprudence does not compel this Court to depart from its prior decisions recognizing community-caretaking as a basis for a warrantless search in appropriate circumstances. *See Edmonds, supra,* 211 *N.J.* at 144 & n. 14, 47 *A*.3d 737; *Bogan, supra,* 200 *N.J.* at 73–74, 975 *A*.2d 377; *Diloreto, supra,* 180 *N.J.* at 275–76, 850 *A*.2d 1226. Absent a United States Supreme Court decision holding that the community-caretaking doctrine does not apply to the search of a home, this Court's prior recognition of a circumscribed doctrine in the residential setting was, in my view, entirely consonant with federal law.

I respectfully submit that the community-caretaking doctrine, as an independent basis for an objectively reasonable warrantless search, more effectively balanced individual liberties and effective law enforcement before the majority imposed the "objectively reasonable emergency" requirement in this case. If a police officer is called to a home whose occupant is reported to be absent, he or she may quickly be able to determine whether there is any reason to be concerned for the individual's safety. Conversations

---

13 Indeed, none of the federal appellate cases confront the precise issue here— law enforcement's entry into a home, prompted not by suspicion that the resident has violated the law but a 9–1–1 call reporting that the resident appeared to be missing. *See Ray, supra,* 626 *F*.3d at 171–72 (finding mother attempted to pick up her daughter, as scheduled for court-ordered visitation, at husband's home, in which there was no response to the doorbell and called the police); *Quezada, supra,* 448 *F*.3d at 1006 (determining sheriff went to apartment to serve woman with a child protection order); *Rohrig, supra,* 98 *F*.3d at 1509 (discovering officers received a noise complaint and responded to the residence); *Bute, supra,* 43 *F*.3d at 532–33 (learning sheriffs noticed an open garage door in an apparently abandoned manufacturing plant and suspected burglary or vandalism); *Erickson, supra,* 991 *F*.2d at 530 (recognizing officers responded to a home to investigate a reported, suspected burglary); *York, supra,* 895 *F*.2d at 1027 (finding deputy responded to a call of threatened violence); *Pichany, supra,* 687 *F*.2d at 205 (noting officers responded to call concerning a burglary at a business).

with neighbors might reveal that the occupant of the residence is on vacation, visiting relatives or recovering from surgery. In such a case, the officer is in a position to resolve any safety concerns without entering the residence of the person involved.

Yet not all of our residents have close bonds with their neighbors. Many people live far from family and friends. A person living alone may be isolated by age, illness, a language barrier or the transient nature of many modern communities. A police officer responding to a report of a missing person must consider a spectrum of possibilities, from an innocuous absence for personal or business reasons to an accident, illness or crime in the home that has left the resident unable to summon assistance. Despite diligent inquiries, the officer may be unable to determine whether there is "an objectively reasonable emergency" unless he or she enters the residence. That officer's community-caretaking intervention—including entry into the home to check on the resident's welfare—could be desperately needed. Yet under the majority's decision, that intervention should not occur unless and until law enforcement concludes that there is, indeed, an emergency, or obtains a search warrant under a standard that the majority does not define.[14] I respectfully submit that this constraint is not constitutionally mandated, and is impractical.

---

[14] Outside of situations involving administrative warrants or warrants pursuant to statutory authority that are irrelevant here, our courts have yet to articulate a standard for the issuance of a search warrant when no criminal offense is suspected. Indeed, the situation addressed by the Third Circuit decision in *Ray* illustrates the practical difficulties that police officers might encounter when they seek a search warrant unrelated to a criminal investigation. There, officers responded to a mother's report that her estranged husband had custody of a young child, and did not respond to knocking at the door of his home. *Ray, supra*, 626 *F*.3d at 171–72. The officers contacted a New Jersey municipal judge "for guidance as to whether the officers could 'go in the house to look'" for the child. *Id.* at 172. Instead of providing the requested permission for a residential search, the judge issued a warrant for the father's arrest, which was later voided. *Ibid.* A judge's confusion about a police request for a search warrant untethered to any criminal investigation may bar or delay a residential search when time is of the essence.

## II.

This case illustrates the implications of the majority's formulation of the community-caretaking doctrine. The Court applies the exclusionary rule, intended to deter search and seizure violations and "to ensure that police do not 'profit' from lawless behavior." *State v. Herrerra,* 211 *N.J.* 308, 330, 48 *A.*3d 1009 (2012) (quoting *State v. Evers,* 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003)). It is a harsh sanction for police conduct that, in my view, was anything but "lawless." The police officer who responded to a 9–1–1 call from defendant's landlord had limited information. He learned that defendant's rent was unpaid, that defendant did not respond to the landlord's knocks on his door or voicemails on his telephone, and that for a two-week period defendant's car had been unattended, his trash can had been left outside and his mail had accumulated. The officer also learned that other tenants had not seen defendant for at least several days.

With the precision of hindsight, we know that there was no emergency. Defendant was not injured, ill or dead in his apartment, but under arrest as the result of an unrelated New Jersey State Police investigation, of which the Vineland police officer, who responded to the landlord's 9–1–1 call, was unaware. Yet when the officer investigated the landlord's call, the facts available to him suggested several possible scenarios, some of them raising the specter of an emergency. I concur with the Appellate Division panel that a prudent and reasonable officer, with no investigatory motive and no purpose other than to fulfill his or her community-caretaking duties, would enter a residence under these circumstances.

In my view, our law can effectively vindicate constitutional rights against unreasonable search and seizure, yet permit police officers to take prompt and potentially life-saving action when the facts are unavoidably unclear. I consider the search in this case to be consistent with constitutional standards, and would affirm the Appellate Division panel's decision. I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, RODRÍGUEZ (t/a) and CUFF (t/a)—6.

*For dissentment*—Justice PATTERSON—1.