NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5838-13T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANIEL MORDENTE, a/k/a KEIS EVAN
HAMWAY, DANIEL MORDENT,

     Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **March 2, 2016** |
| **APPELLATE DIVISION** |

Submitted December 2, 2015 — Decided March 2, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 12-06-0509.

Triarsi, Betancourt, Wukovits & Dugan, LLC, attorneys for appellant (Steven F. Wukovits, on the brief).

Grace H. Park, Acting Union County Prosecutor, attorney for respondent (Stephen K. Kaiser, Special Deputy Attorney General/Acting Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

After losing a motion to suppress evidence of numerous marijuana plants growing in his basement, defendant Daniel

Mordente[1] pled guilty to third-degree possession of marijuana plants with the intent to distribute within 1000 feet of a school, N.J.S.A. 2C:35-7. The first-degree charge of operating a marijuana production facility, N.J.S.A. 2C:35-4, and three other related lesser drug charges were dismissed. Defendant was sentenced to probation for five years with six hundred hours of community service. He now appeals from the denial of his motion to suppress. We affirm based on the State's right, as part of its community-caretaking function, to search a home for a missing person in an emergency.

The testimony at the suppression hearing reveals the following facts. A Plainfield police officer went to defendant's home at approximately 8:25 a.m. on February 8, 2012, in response to defendant's report that his sixty-five year old mother, who suffers from dementia, was missing since 11:30 p.m. the night before. Six months earlier this officer had received a similar report and on that occasion defendant's mother was later found approximately eight miles away. When the officer arrived one of the mother's caretakers was present at the home. Defendant was out searching for his mother with a different caretaker. He was called to the home, arriving ten minutes later. Defendant allowed

_____

[1] The co-defendant did not participate in this appeal and we were provided no information regarding the result of charges against him.

the officers to enter, and signed a police missing person report. Defendant was "distraught and frantic." He reported to the police officer that he had already searched the home, and then left to continue looking for his mother.

Approximately one hour later, after entering the missing person report in the National Crime Information Center (NCIC) data base[2] at headquarters, the officer returned to the home where he met the Union County Sheriff's Department K-9 unit. They asked the caretaker for a piece of clothing belonging to the missing woman to acquire her scent and also received permission from the caretaker to enter the house to search it pursuant to the Sheriff's Department missing person protocol.

Sheriff's Officer Ryan Wilson testified that he had served as a K-9 handler with the Union County Sheriff's Office for five years. He had participated in more than fifty searches for missing persons. He testified: "Part of my initial investigation for all missing persons cases is to actually - - I check the home myself, areas where people could hide, areas that may have been overlooked

---

[2]  The NCIC maintains "a computerized database of criminal justice information available to law enforcement agencies nationwide." State v. Sloane, 193 N.J. 423, 433 (2008). According to the Federal Bureau of Investigation website, "NCIC helps criminal justice professionals apprehend fugitives, locate missing persons, recover stolen property, and identify terrorists." National Crime Information Center, FBI.gov, https://www.fbi.gov/about-us/cjis/ncic/ncic (last visited Dec. 8, 2015). The NCIC apparently assisted in locating defendant's mother.

by a family member because they're distraught or upset at the time." He also testified to three specific instances where he located a missing person inside the home after family members had indicated that the house was clear. He specifically described an incident where an elderly woman in a nursing home was found behind a locked door.

During his search of the home, which was done without a dog, Wilson began on the top floor. Wilson found the basement door locked. The caretaker did not have a key, but the Plainfield police officer was able to "pop open" the door using his "pen light." Both officers testified that after the door was opened they smelled the strong odor of marijuana. They descended the stairs and looked around the basement, finding several marijuana plants, but not the missing woman. A warrant was obtained and the plants were seized. The missing woman was located at Pennsylvania Station in Newark sometime after 10:00 a.m. that morning, after the officers entered the basement.

The motion judge found that the police had "an objectively reasonable basis to believe that immediate police action was necessary based on [] defendant's emergency call to police." The judge also found it relevant that defendant had left the initial officer in the home in the company of the caretaker, and determined

4

that the officers were not restricted to a search outside of the home because defendant thought his mother was not in the home.

On appeal defendant raises the following issues:

> POINT I: THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED THE DEFENDANT'S MOTION TO SUPPRESS.
>
> A.    REASONABLENESS STANDARD.
>
> B.    COMMUNITY CARETAKING FUNCTION.
>
> C.    EXIGENCY STANDARD.
>
> POINT II: THE FRUIT OF THE POISONOUS TREE DOCTRINE SHOLD BAR ALL EVIDENCE SEIZED AS A DIRECT CONSEQUENCE OF THE UNLAWFUL POLICE ACTIVITY.

"We consider the factual findings of the trial court, premised upon detailed testimony elicited in a lengthy suppression hearing, in accordance with a deferential standard of review." State v. Rockford, 213 N.J. 424, 440 (2013).  It is well established that we "should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record."  State v. Locurto, 157 N.J. 463, 474 (1999).  Moreover, in reviewing a trial court's determination, we are careful not to substitute our decision merely because we might have concluded differently.  State v. Elders, 192 N.J. 224, 244 (2007).

5

Our Supreme Court recently held that "the community-caretaking doctrine is not a justification for the warrantless entry and search of a home in the absence of some form of an objectively reasonable emergency." State v. Vargas, 213 N.J. 301, 305 (2013). In Vargas, a landlord called the police after a tenant failed to pay rent, his mail piled up, and his car was left unmoved and unattended in the driveway for two weeks. The police conducted a "welfare check" during which illicit drugs were discovered. Id. at 307-08. The Court determined explicitly that "[w]ithout the presence of consent or some species of exigent circumstances, the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home." Id. at 321.

Nevertheless, in Vargas, Justice Albin also explained:

> In that regard, this is unlike the case of a close family member whose housebound elderly relative is not responding to telephone calls and knocks on the door. Nor is this like the case of a diabetic or infirm neighbor who is not seen carrying out routine daily activities and who is not answering the door or the telephone. We need not describe the myriad circumstances that might give rise to an objectively reasonable basis to believe that an emergency requires immediate action for the safety or welfare of another.

> [Id. at 327.]

Here, the motion judge found there was an emergency; a woman suffering from dementia was missing. The motion judge also credited the testimony of Sheriff Officer Wilson that it was

6

established protocol to search the home in every missing person's case to ensure that the individual had not been overlooked by a distraught relative. Importantly, there was no evidence that any officer had an ulterior motive to search the home for illegal activity. The sole reason the officers were at the home was at defendant's urgent request to help find his mother. Defendant had also given no indication that he did not want his home searched. To the contrary, defendant had previously invited an officer into the home and his actions reflected a paramount desire to find his mother as soon as possible. Thus, all the facts establish that the sanctity and privacy of this home was not being invaded; rather, the sole object of the search of the home was to find a missing person as part of law enforcement's community-caretaking function.

Our dissenting colleague views the search of the home as a mechanical adherence to protocol rather than a response to exigent circumstances. The facts demonstrate a true emergency where time was of the essence. Defendant's mother suffered from dementia, she had been missing overnight in the wintertime, and defendant himself was clearly extremely worried about her welfare. The possibility that the basement door had been locked by her after she entered the basement, and that she had then fallen down the steps was posited by the motion judge and accepted by counsel as

7

a distinct possibility.  The fact that Officer Wilson was following established protocol in searching the home top to bottom does not undercut the conclusion that he was responding to an emergency.  Indeed, it is often the case that standard police protocols are designed specifically to respond to emergency situations.  See id. at 315.

This factual scenario fulfills the "objectively reasonable basis to believe that an emergency requires immediate action for the safety or welfare of another."  Ibid.  The fact that more than an hour had elapsed from the time of the initial report to the actual search reflects the practical realities of calling in a specially-trained missing persons unit, not a reduction in the emergent nature of the situation.  While the dissent's affirmation of the unique and powerful protections afforded to the home by the Fourth Amendment, State v. Wright, 221 N.J. 456, 467 (2015), is unassailable, in this instance the situation presented the type of crisis requiring immediate action of  emergency responders who specialize in finding missing persons.  The community—caretaking function of the police was not used as a pretext to search the home.  The officers did not detect the odor of marijuana emanating from the basement until they opened the basement door.  To defendant's credit, his concern for his mother overcame his fear of law enforcement involvement, and he called the police to assist

8

in finding his mother.  The police did their best to locate his mother as they were trained to do, but also inadvertently happened upon defendant's illegal drug activity.  Defendant's mother was found, as were his marijuana plants.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5838-13T1

**FUENTES, P.J.A.D., dissenting**

Applying the community-caretaking doctrine, my colleagues in the majority found the warrantless search of defendant's home was constitutionally permissible. I respectfully disagree.

The majority's legal conclusion is grounded on the finding by the motion judge that the search conducted by Sheriff's Officer Ryan Wilson, following a missing person protocol adopted by the Union County Sheriff's Department, was lawful. The record shows, however, that the search Wilson conducted pursuant to this alleged protocol was not rationally related to the facts known to the police at the time. Rather, Wilson robotically carried out a room-by-room search of defendant's entire residence, including the first floor and kitchen area where Plainfield Police Officer Kevin Egbert and the caretaker were present. Wilson conducted this search without the assistance of his K-9 partner whom, by Wilson's own description, was especially trained to detect the scent of missing persons. Indeed, the dog never entered defendant's home nor was it given an article of clothing previously worn by defendant's mother to acquire her scent.

In my view, the highly intrusive, wide ranging search conducted by Sheriff's Officer Wilson long after defendant had

called the police to report his mother was <u>missing from the</u> <u>home</u>, is the antithesis of the narrowly tailored, fact-sensitive, exigent-circumstances-driven scenarios our Supreme Court envisioned in <u>State v. Vargas</u>, 213 <u>N.J.</u> 301 (2013). Under the controlling facts of this case, the missing person protocol adopted by the Union County Sheriff's Department would license the type of "roving commission to conduct a nonconsensual search of a home" the Court rejected in <u>State v. Edmonds</u>, 211 <u>N.J.</u> 117, 143 (2012). I reach this conclusion based on the testimony of the two law enforcement officers the State called as witnesses in the suppression hearing.

City of Plainfield Police Officer (now Detective) Kevin Egbert testified that, at approximately 8:25 a.m., on February 8, 2012, he responded to defendant's home on Woodland Avenue to investigate a report of a "missing elderly female." On his arrival, he was greeted on the front porch of the residence by a woman who identified herself as the missing woman's caretaker. Officer Egbert asked the caretaker for the location of the missing woman's son (defendant) "because [he] was the one [who] placed the call, according to [the] dispatcher." The caretaker told Officer Egbert defendant "was out looking for his mother."

In response to his questions, the caretaker told Officer Egbert that she had arrived at "around 8 o'clock [a.m.],"

2

chatted briefly with defendant, and "then they went upstairs to look for the mother and she was missing." Officer Egbert's testimony does not make clear how much time transpired during his conversation with the caretaker. Sometime thereafter Officer Egbert called defendant using the caretaker's cellphone and spoke to him to gather the information necessary and obtain his authorization "to file a Missing Person's Report." Defendant eventually returned to the house while Officer Egbert was still there. Based on the following testimony from Officer Egbert, I infer Officer Egbert did not enter defendant's home until defendant arrived accompanied by a woman who appeared to be the senior caretaker.

> Q. Okay. At . . . some point, did you speak to Mordente?
>
> OFFICER EGBERT: Yes. <u>Due to the fact that we had to file a Missing Persons' Report, our protocol is to contact the person that's calling us or the responsible party and sign off on what's called an NCIC[1] Missing Persons Report</u>.
>
> Q. And could you explain how that . . . took place?

---

[1] The National Crime Information Center [NCIC] "helps criminal justice professionals apprehend fugitives, locate missing persons, recover stolen property, and identify terrorists. It also assists law enforcement officers in performing their official duties more safely and provides them with information necessary to aid in protecting the general public." <u>National Crime Information Center</u>, Federal Bureau of Investigation, https://www.fbi.gov/about-us/cjis/ncic (last visited February 4, 2016.)

OFFICER EGBERT:  I contact - - I asked [the caretaker] if she could call him on the cell phone, which she did, and I spoke to [defendant] utilizing her cell phone and advised him that he needed to come back so we can get this re - - investigation started.

. . . .

OFFICER EGBERT: After Mr. Mordente entered - - got to the house, we went inside, went to the kitchen area, and we began talking.  I advised him that we needed to get a signature because the report can't be filed and we can't do our job to look for further for her unless we have him signed off on.  He gave me a brief examp - - brief description of what she was wearing last night - - or the night before, signed off on the form.  He advised me around 11 o'clock he put her to bed and that was the last time that he actually saw her.

. . . .

Q. Okay.  And when Mr. Mordente returns to the house . . .  did he have - - was anyone with him?

OFFICER EGBERT:  Yes.  Ann Roselle. Apparently she might be a senior caretaker or in charge of [the daytime caretaker].

Q.  And at some point, did you inquire as to whether Mr. Mordente had looked for his mother in the house?

OFFICER EGBERT: Yes.  During the time talking to him I stated, have you searched the house? He said, yes, I had.  And that was it.  That's all I remember about that.

Q.  Okay.  So, after you spoke to Mr. Mordente and you - - and you got him to sign the form, what did you do at that point?

4

OFFICER EGBERT: Well, after I had Mr. Mordente sign it, he was very distraught and frantic and he just said, I'm going back out looking for her. . . . At that point, <u>I finished writing up my notes on my report and I left the house</u>.

Q. Where did you go?

OFFICER EGBERT: I went to headquarters to get that report into the system.

. . . .

After I got back to headquarters and finished that paperwork - - you know, sign off on it, make sure all the blocks were filled in that I had information to, I give it to the service person, they enter it into the computer system. At that time, I started writing my report.

Sergeant Richards, my immediate supervisor, advised me that the K-9 Unit was located and they're in route back to [defendant's residence] to start the search for [his mother]. At that time, I packed up my stuff and responded back to the house.

Q. And Detective, approximately how far would you say headquarters is from [defendant's residence]?

OFFICER EGBERT: About five minutes.

Q. Okay. And could you describe the situation when you returned to [the residence]?

OFFICER EGBERT: <u>I responded there and I waited for the Union County Sheriff's Officers to show up. Once they arrived, we went back to the door</u>, knocked on it, [the caretaker] was still there. <u>We advised her that we needed a piece of clothing from [defendant's mother] so the dog can take a sniff and start searching. And the Sheriff's Officers asked</u>

5

> if they can search the house for her because
> that's their protocol.

[(emphasis added).]

Officer Egbert's testimony leaves no doubt about the absence of the indispensable element that must be present to justify the warrantless entry of a home based on the community-caretaking doctrine - <u>exigency</u>. As Justice Albin made clear in <u>Vargas</u>:

> Police officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement. Under the emergency-aid doctrine, a police officer can enter a home without a warrant if he has "'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury'" and there is a "'reasonable nexus between the emergency and the area or places to be searched.'" In other words, "if police officers 'possess an objectively reasonable basis to believe' that prompt action is needed to meet an imminent danger, then neither the Fourth Amendment nor Article I, Paragraph 7 demand that the officers 'delay potential lifesaving measures while critical and precious time is expended obtaining a warrant.'" Indeed, the rationale of the emergency-aid exception is informed in large measure by the community-caretaking responsibilities of government officials. . . .
>
> [<u>Vargas</u>, <u>supra</u>, 213 <u>N.J.</u> at 323-324 (internal citations omitted).]

Officer Egbert's testimony described the execution of the Plainfield Police Department's established protocol for

6

responding to a report of a missing person. He was not dispatched to defendant's mother's residence to provide emergency aid; he was there to gather information to complete a written report that is thereafter inputted into the NCIC database. Officer Egbert candidly testified that he accepted defendant's representation that he had searched the entire residence to confirm his mother was not in the house before calling the police to report her as a missing elderly person with cognitive impairments.

Officer Egbert also made equally clear that the Sheriff's Department's K-9 unit was there to obtain an article of defendant's mother's clothing "so the dog can take a sniff and start searching." The Sheriff's request to search the home was a mere formality, a mechanical adherence to the Sheriff's Department's protocol untethered to any evidence that indicated the responding officers actually believed defendant's mother was inside the house. The following testimony from Sheriff's Officer Wilson unambiguously supports this conclusion.

> SHERIFF'S OFFICER WILSON: Upon our arrival, our . . . standard is to obtain information regarding the victim. We'll obtain clothing description, physical description. From there we'll get a last time seen, whereabouts. If it's a house, in a case like this and the other cases of a missing person, we'll usually ask to gain entry to the residence, again, to search the residence because of past cases

7

I've had where subjects have been still located within the residence.

Q. Did you become aware . . . the time [defendant's mother] was last seen?

SHERIFF'S OFFICER WILSON:  Yes, I was.

Q. And what was that time?

SHERIFF'S OFFICER WILSON:  I believe . . . she was last seen around 8 a.m. that morning or - - I'm sorry.  She was last seen the night prior around - - I don't have the last time.

    . . . .

[After attorneys' conferred off the record, the prosecutor apprised the motion judge he was "going to move on."]

Q.  Do you remember how long she had been missing for at that point, even if you don't remember the exact time?  Approximately how long it had been.

SHERIFF'S OFFICER WILSON:  At the time of our arrival at approximately 9:30 [a.m.], we were advised that it was noticed that she was missing since approximately 8 a.m., 8:20 a.m. that morning.  So . . . roughly an hour and change by the time we arrived on scene.

    . . . .

Q. Okay.  And what did you do after you met with Officer Egbert?

SHERIFF'S OFFICER WILSON:  After we met with Officer Egbert, again, we . . . obtained a description, last known location, basically she was last see within the confines of the residence. And roughly when she went missing. And that's what we obtained upon initial arrival.

8

Q. Okay. And what . . . did you do after you had that information from Officer Egbert?

SHERIFF'S OFFICER WILSON: After we had this information, then . . . we went into our - - our usual procedure where we would go in, speak to someone in the house, if anyone was there, and check the residence.

Q. Now at that point, were you concerned about the safety of [defendant's mother]?

SHERIFF'S OFFICER WILSON: Yes, I was.

Q. [H]ow did the search for [defendant's mother] proceed?

SHERIFF'S OFFICER WILSON: Upon entry into the home, I start usually at the top down. So I'll go to the second floor first and I'll clear the . . . the second floor and then work my way down. It's . . . not a search . . . in a sense . . . under every nook and cranny. It's . . . <u>places a person would hide</u>. Under beds, in closets, behind shower curtains, things of that nature.

. . . .

And upon completing all these areas on the second floor, I then move down to the first.

Q. When you were . . . conducting that search, were you . . . looking for . . . did you suspect any criminal activity?

SHERIFF'S OFFICER WILSON: No. I did not.

Q. Now, what happened after you went to the second floor?

SHERIFF'S OFFICER WILSON: After I went to the second floor, <u>the second floor was cleared of all areas a person could possibly hide, an adult person</u>. After completion of that search, I moved down to the first floor.

9

Q. And what happened?

SHERIFF'S OFFICER WILSON: There was negative findings on the second floor for [defendant's mother]. So, upon that . . . <u>I went down the first floor and then completed the same routine search there</u>. All common places; the kitchen, the living room, closets. And also, that was negative as well. [Defendant's mother] was not located on the first floor.

Q. Okay. After you cleared the first floor, then what did you do?

SHERIFF'S OFFICER WILSON: There was one door on the first floor that was locked. We weren't sure where that door led, whether it was to a closet or what. We were able to gain entry to that door.[2] . . . We learned it was a basement upon opening the door.

Q. And again . . . at the point before you opened that door, do you suspect anything criminal?

SHERIFF'S OFFICER WILSON: Nothing at all.

Q. All right. So, what happens once you open that - - once Officer Egbert opens that door?

SHERIFF'S OFFICER WILSON: Once we open the door and we begin to go downstairs, we were met with a strong odor, to be known - - it was marijuana.

Q. And did you continue to go downstairs?

SHERIFF'S OFFICER WILSON: Yes, we did.

Q. And what did you do in the basement?

---

[2] The caretaker who was in the house during this entire search did not have the key to this door. The Sheriff's Officer gained entry by forcing the lock open.

10

> SHERIFF'S OFFICER WILSON: In the basement we searched all the areas, again, where a person might hide. There was a lot of debris and garbage and junk down there, for the most part . . . scattered about. So, we checked behind those areas in case she had fallen down there or gotten hurt. Again, she had been missing quite some time, that we knew, so we weren't sure what state she would have been in.

[(emphasis added).]

The room-by-room search described by Sheriff's Officer Wilson is not part of the protocol of the K-9 unit. Sheriff's Officer Wilson later testified that after he completed the search of the house, they went to defendant's mother's bedroom on the second floor to retrieve an article of her clothing, "namely pajamas." The dog especially trained for this task did not enter the house at any time. Before taking any meaningful action to find this cognitively impaired elderly woman, the officers received a radio transmission that she had been found in Newark, approximately fourteen miles from Plainfield.

Under these facts, the motion judge found:

> [Defendant's mother] was 65 years old at the time of this incident. In addition, unlike Vargas, the police were aware that [she] suffered from dementia and was, therefore, at times not fully conscious of her actions and surroundings. The defendant clearly acknowledged the urgency of the situation when he departed from the home in order to search for his mother, leaving the Officers in the home with only the caretaker. <u>Witnesses allege that defendant grew agitated at the</u>

11

amount of time it was taking the Officer to
begin searching for [his mother].

Therefore, given the circumstances here, the
police did have an objectively reasonable
basis to believe that immediate police action
was necessary based upon defendant's emergency
call to police.  While the police's knowledge
that [defendant's mother] did previously
wander away from home is relevant here, it is
reasonable to check a door to see if it is
unlocked before you break it down.  And here,
it was reasonable for the Officers to check
within the home to verify that [defendant's
mother] was not in the immediate area before
continuing their search outward.

[(emphasis added).]

The motion judge's analysis and ultimate conclusion here

are irreconcilable with the Court's explication of the emergency

aid doctrine in Vargas.  I quote Justice Albin's emphatic and

unambiguous language in Vargas to highlight the inapplicability

of the community caretaking doctrine to the uncontested salient

facts of this case:

Under the emergency-aid doctrine, a police
officer can enter a home without a warrant if
he has "'an objectively reasonable basis to
believe that an emergency requires that he
provide immediate assistance to protect or
preserve life, or to prevent serious injury'"
and there is a "'reasonable nexus between the
emergency and the area or places to be
searched.'"

[Vargas, supra, 213 N.J. at 323 (quoting
Edmunds, supra, 211 N.J. at 132).]

12

Here, the motion judge noted the connection between defendant's agitation with the slow pace of the police's response and his decision to take matters into his own hand. However, instead of fixing fault for this delay where it belonged, on the lethargic response by the officers at the scene, the judge uses defendant's sense of urgency to justify the officers' warrantless search of his home. The room-by-room search described by Sheriff's Officer Wilson was nothing more than a perfunctory execution of an inapplicable protocol. The Sheriff's Department was summoned to this scene because it was expected it would use the K-9 Unit to aid in the search of defendant's mother, not to conduct a room-by-room search of the home that Officer Egbert was clearly capable of conducting if he thought it was warranted. The fact that Officer Egbert testified he believed defendant's representation that he had searched the house before calling the police corroborates this self-evident observation.

In Vargas, Justice Albin explained the type of emergency aid situations the Court envisioned would trigger the application of the community-caretaking doctrine by quoting then Judge (later Chief Justice) Burger, in Wayne v. United States:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an

13

injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.

[Vargas, supra, 213 N.J. at 324 (quoting 318 F. 2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860, 84 S. Ct. 125, 11 L. Ed. 2d 86 (1963)).]

Sheriff's Officer Wilson's robotic execution of the Sheriff's Department "missing person protocol" reflects none of the exigency or urgency that justifies the highly intrusive, wide ranging warrantless search of the residence that occurred here. The record also shows defendant did not consent to the search of his home. "Without the presence of consent or some species of exigent circumstances, the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home." Vargas, supra, 213 N.J. at 321.

I conclude by quoting Chief Justice Rabner's recent reaffirmation of the unique status a home has under our Nation's and our State's constitutional jurisprudence:

As the Court has repeatedly observed, the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.

The unique status of the home has been recognized for centuries. And throughout our nation's history, one of our most protected rights . . . has been the sanctity and privacy of a person's home. Those interests "are entitled to the highest degree of respect and

14

protection in the framework of our constitutional system."

The United States Supreme Court recently reaffirmed the heightened status of the home under the Constitution. The Court observed that "when it comes to the Fourth Amendment, the home is first among equals" and stands "at the Amendment's very core."

This Court also recently emphasized the preeminent position of a private residence when it held that the community-caretaking doctrine, standing alone, could not justify a warrantless search of a home.

[State v. Wright, 221 N.J. 456, 467 (2015) (internal citations omitted).]

Because the search conducted here by the Union County Sheriff's Department in conjunction with a Plainfield Police Officer was not justifiable under the community-caretaking or emergency-aid doctrine, I would reverse the order of the trial court denying defendant's motion to suppress. Because my colleagues in the majority have concluded otherwise, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-5838-13T1