J-A11026-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY DION SHAW | : | No. 1400 MDA 2019 |

Appeal from the Order Entered August 5, 2019
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0003023-2018

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:             **FILED SEPTEMBER 01, 2020**

The Commonwealth of Pennsylvania appeals from the order granting Anthony Dion Shaw's pre-trial motion to suppress evidence. We vacate and remand for further proceedings.

The suppression court made the following findings of fact:

1. On May 3, 2018, Officer Sherise Wilson of the East Orange New Jersey Police Department was dispatched to [Shaw's] apartment located at 74 South Munn Avenue, Apartment 11, East Orange, New Jersey.

2. Officer Wilson was dispatched to [Shaw's] apartment to check on the well-being of [Shaw] because he had not reported for work for two days.

3. Officer Wilson arrived at the apartment complex where [Shaw] resided and located Apartment 11 which was the unit occupied by [Shaw].

---

[*] Former Justice specially assigned to the Superior Court.

4. Although Officer Wilson knocked on the door several times, she received no response.

5. Officer Wilson did not hear or smell anything unusual and actually heard nothing while she was at the door to [Shaw's] apartment.

6. Several tenants of the apartment complex were questioned by Officer Wilson regarding [Shaw] however none of them knew him.

7. After unsuccessfully attempting to locate [Shaw] in his apartment, Officer Wilson made contact with the building superintendent.

8. During a discussion with the superintendent, Officer Wilson commented that she didn't hear or smell anything unusual while she was outside [Shaw's] apartment.

9. The superintendent advised Officer Wilson that [Shaw] was neither sickly nor elderly.

10. Officer Wilson told the superintendent that [Shaw] may be on vacation out of the country without cell phone service or may just want to be left alone.

11. Without encountering anything unusual or any type of emergency requiring that she provide immediate assistance to protect or preserve life or prevent serious injury, Officer Wilson had the superintendent unlock the door to [Shaw's] apartment so she could enter.

12. After entering [Shaw's] apartment with her sergeant, Officer Wilson observed blood on the floor and proceeded into a bedroom where she found [Shaw] lying on the floor.

13. [Shaw] stated that he had tried to kill himself.

14. Officer Wilson then walked through [Shaw's] apartment and located three knives, a notebook containing a handwritten note and other items eventually seized by the East Orange Police Department.

15. After locating the notebook, Officer Wilson proceeded to read the handwritten note contained therein.[1]

16. Officer Wilson's testimony was corroborated by the video recorded on her body camera.

17. Emergency personnel responded to the scene and began treating [Shaw] for a self-inflicted knife wound to his neck.

18. [Shaw] was then transported to Rutgers University Hospital and several items of evidence were taken from his apartment by the East Orange Police Department including three knives, the notebook containing a handwritten note, two blood swabs, a gold cell phone and [Shaw's] New Jersey driver's license.

19. Sometime after the suicide attempt, the Office of the Luzerne County District Attorney contacted Detective Michael McCusker of the East Orange Police Department regarding [Shaw] and his possible involvement in the death of the victim which occurred on or about May 1 or 2 of 2018.

20. [Shaw] had been in a relationship with the victim prior to her death and became a suspect in the homicide.

21. The Wilkes-Barre Township Police Department obtained a search warrant for [Shaw's] 2003 Mercury Sable bearing New Jersey registration K3 8DZH from the Luzerne County Court of Common Pleas on May 4, 2018.

22. Detective McCusker then obtained a search warrant on May 5, 2018 from the East Orange Municipal Court for the same vehicle using the Luzerne County warrant to establish probable cause.

23. This vehicle was transported to Luzerne County and searched on May 11, 2018.

24. During the search of [Shaw's] 2003 Mercury Sable, the Office of the Luzerne County District Attorney and/or the Wilkes-Barre Township Police Department seized a Kmart receipt, Gerber knife packaging, two swabs of suspected blood and a fingerprint.

25. Also on May 4, 2018, the Wilkes-Barre Township Police Department obtained a search warrant from the Luzerne County

_____

[1] The handwritten note contained an apology by Shaw to the family of Cindy Lou Ashton ("the victim"). Pa.R.A.P. 1925(a) opinion, 10/11/19 at 2.

Court of Common Pleas for [Shaw's] apartment located at 74 South Munn Avenue in East Orange, New Jersey.

26. Detective McCusker obtained a search warrant from the East Orange Municipal Court for [Shaw's] apartment on May 5, 2018 using the Luzerne County warrant to establish probable cause.

27. During the search of [Shaw's] apartment on May 5, 2018, the Office of the Luzerne County District Attorney and/or the Wilkes-Barre Township Police Department seized twenty-three items listed on the Wilkes-Barre Township Police property record and attached hereto as Court Attachment "A".

28. A third search warrant was obtained by the Wilkes-Barre Township Police Department on May 4, 2018 from the Luzerne County Court of Common Pleas for an evidence locker located at the East Orange Police Department.

29. Detective McCusker then obtained a search warrant from the East Orange Municipal Court for the items contained in the evidence locker on May 5, 2018 using the Luzerne County warrant to establish probable cause.

30. During the search of the evidence locker, the Office of the Luzerne County District Attorney and/or the Wilkes-Barre Township Police Department obtained the three knives, the notebook containing a handwritten note and a gold cell phone.

31. On May 5, 2018 law enforcement officers from the Office of the Luzerne County District Attorney and/or Wilkes-Barre Township Police Department proceeded to the Rutgers University Hospital to interview [Shaw].

32. Prior to initiating any questioning, [Shaw] was properly provided with, and waived, his Constitutional right to remain silent pursuant to *Miranda v. Arizona*.[2]

33. During the interview, [Shaw] was confronted with evidence obtained by the East Orange Police Department while in [Shaw's] apartment during the welfare check on May 3, 2018 such as the handwritten note from the notebook.

34. On May 10, 2018, the Office of the Luzerne County District Attorney and/or the Wilkes-Barre Township Police Department

_____

2 *Miranda v. Arizona*, 384 U.S. 436 (1966).

obtained a search warrant from the Luzerne County Court of Common Pleas to take a buccal swab from [Shaw].

35. Detective Robert O'Neal of the Essex County Prosecutor's Office obtained a search warrant from the Superior Court of New Jersey on May 10, 2018 for the buccal swab using the Luzerne County warrant to establish probable cause.

36. On May 11, 2018 a buccal swab was taken from [Shaw] while a patient at Rutgers University Hospital by the Office of the Luzerne County District Attorney and/or Wilkes-Barre Township Police Department.

37. The affidavits of probable cause for all four search warrants obtained from the Luzerne County Court of Common Pleas contain the following language:

> On May 4, 2018, Affiants learned that on the previous day (May 3, 2018) law enforcement officers from the East Orange, NJ Police Department responded to a welfare check at 74 South Munn Avenue, Apt 1I East Orange, NJ 07018; believed to be the residence of Anthony D. Shaw. SHAW is believed to have attempted suicide within the Apartment and was transported for medical treatment.

> On May 4, 2018, Affiants from the Luzerne County District Attorney's Office and Wilkes-Barre Township Police Department learned of SHAW's location and his apparent suicide attempt that occurred on May , [*sic*] 2018. Affiants also learned that multiple items were seized by the East Orange Police Department including one (1) large straight knife with red handle, two (2) folding knives (one folding knife has a black/grey handle and one folding knife has a black handle), one (1) handwritten note in a burgundy colored one subject oxford notebook, and one (1) gold in color Samsung Note 5 cellular phone. These items were seized as part of the suicide investigation and logged into evidence at the East Orange Police Department (Essex County, NJ) located at 15 South Munn Avenue, East Orange, NJ 07018.

> On May 4, 2018, Affiants from the Luzerne County District Attorney's Office and Wilkes-Barre Township Police Department learned that New Jersey authorities located SHAW's Mercury Sable vehicle. The vehicle is a silver in color

> Mercury Sable sedan with sunroof, NJ registration K38DZH and VIN #IIVIEFM55S436617739.
>
> 38. The search warrants obtained from the Luzerne County Court of Common Pleas were attached as exhibits to the search warrants applied for and obtained in Essex County, New Jersey.
>
> 39. On May 22, 2018, [Shaw] was charged with one count of criminal homicide.

Findings of Fact and Conclusions of Law, 8/5/19, at 1-6 (unpaginated).

Significantly, the investigating officer from Luzerne County, Detective Noone, whom the suppression court found credible,[3] testified as follows:

> [Commonwealth]: The specific items of evidence that you gathered that were important to this investigation?
>
> The Court: Outside of the scope of what was in the probable cause affidavits for all the warrants.
>
> [Noone]: Basically we were advised that [victim's] boyfriend or ex-boyfriend or individual that was present with her on the 1st of May, the day prior to her being discovered deceased, we were given a name of Anthony Shaw. Further Investigation gives us an address of Anthony Shaw to be 74 South Munn Ave [*sic*] in East Orange, New Jersey. Our investigation took us to that apartment complex where we observed that there was video cameras amongst the inside and outside of that building.
>
> After speaking to the superintendent there, we were able to view those cameras outside/inside to see what the individual was wearing based on information that we received, what he may have been carrying, any evidence regarding the investigation of the death of the victim. After seeing that information or that video, the defendant does return home in his vehicle into his apartment building, walking up the stairs towards his apartment building.
>
> [Commonwealth]: The vehicle being the 2003 Mercury Sable?
>
> [Noone]: Correct.

---

[3] ***See*** Findings of Fact and Conclusions of Law at 6, ¶40.

[Commonwealth]: Was there also video obtained in the area of the victim's apartment?

[Noone]: Yes.

[Commonwealth]: Describe what type of video was obtained in that area?

[Noone]: Specifically in the video that captured the front of 134 Nicholson Street, Wilkes-Barre Township was a neighbor's front porch video camera which captured the defendant leaving in his said 2003 Mercury approximately 7:48 in the morning on the 2nd of May 2018. That would be leaving the victim's residence.

[Commonwealth]: Were you also able to obtain any records from local businesses putting [Shaw] in the area of Wilkes-Barre or Wilkes-Barre Township around the time of [the victim's] death?

[Noone]: Yes. So the 1st of May 2018 [Shaw] went to Odyssey Fitness Center with Tracy McCoy which would be the uncle of the deceased victim Ashton. They went to the Odyssey Fitness Center where he signed in, paid I believe with a credit card, did some type of physical workout there for a little while and then later on he dropped Mr. McCoy off back at the residence 134 which he lives upstairs. He left there and ultimately went to see a movie at Movies 14 downtown Wilkes-Barre on the 1st of May 2018.

[Commonwealth]: Did you also -- did you obtain any cell phone information of the parties involved after the fact?

[Noone]: Yes, there was a cell phone dump of the phone of the victim and [Shaw].

[Commonwealth]: Would that show any contact between the two of them?

[Noone]: Yeah, there was -- based on the numbers and the information that was known to us, [Shaw] and the victim communicated with one another via text message which we were able to read.

[Commonwealth]: Lastly, did [Shaw] eventually give any statements to investigators that may have placed him in the area at the time or around the time of [the victim's] death?

[Noone]: Yeah, the 5th of May 2018 I interviewed [Shaw] at his bedside in East Orange, Rutgers, I believe, University Hospital. He

was Mirandized. He was willing to speak to us. And he gave a statement of his recollection of events on the time that he spent from approximately noon on May 1st, 2018 until he left the prior morning at 7:48 approximately on the 2nd of May, the events. Which basically he stated that he was in Wilkes-Barre, he went to Odyssey Fitness Center. I believe he did state that he went to the movies earlier in the afternoon, if I'm correct, I could be jogging reports. But ultimately he arrives back at 7 p.m. to 134 Nicholson Street to the victim's residence. When he arrives the aunt was there, she left. Him and the victim had a conversation regarding the relationship. He indicated to me that they resolved their differences with an agreement to be friends with benefits and ultimately they just laid around, never left the apartment, nobody came in, nobody left. He believed that approximately six in the morning on the 2nd of May that the victim gave him a kiss which he was going to leave for the day which the way he described she had a routine: She leaves approximately six in the morning, works out, showers, and then arrives for work and will work through five, six o'clock p.m., give or take.

[Commonwealth]: During the statement that he gave you which was after the warrants were issued, did he admit to operating the Mercury Sable to go back to New Jersey?

[Noone]: Yes. He actually gave me a route he took. To the best of my recollection, review of the reports, that he travelled 81, 380, 80 back to New Jersey…

N.T. Hearing, 6/28/19, at 49-53.

In October 2018, the Commonwealth filed a criminal information against Shaw containing the lone charge of criminal homicide. Prior to trial, in December 2018, Shaw filed an omnibus pre-trial motion seeking to suppress all evidence police seized from Shaw's apartment during both the initial welfare search and the later search pursuant to the Pennsylvania/New Jersey warrants. Shaw also sought to suppress the items police found upon searching his vehicle, his statements to investigators while hospitalized in May 2018, and the DNA evidence officers' collected from him at that time.

- 8 -

Following a suppression hearing, the court issued a briefing schedule listing four specific issues it asked the parties to address, and encouraging the parties to raise any other issues they deemed relevant, and both parties filed briefs. In its brief, the Commonwealth argued, *inter alia*, that the court should not suppress the evidence at issue because the inevitable discovery doctrine applied. The Commonwealth also filed a motion specifically requesting the opportunity to supplement the record with evidence regarding its inevitable discovery argument.

The suppression court issued an order on August 5, 2019, granting the suppression motion, together with findings of fact and conclusions of law. The court found that the evidence at issue should be suppressed because Officer Wilson's initial warrantless entry and search of Shaw's apartment was unconstitutional and therefore all evidence emanating from that search should be suppressed as fruit of the poisonous tree pursuant to the exclusionary rule. The suppression court did not address the Commonwealth's argument under the inevitable discovery doctrine or its bid to supplement the record.

The Commonwealth filed the instant timely appeal and court-ordered Pa.R.A.P. 1925(b) statement. In its Rule 1925(a) opinion, the court once again concluded that Officer Wilson's initial warrantless search was unconstitutional and did not fall under New Jersey's community-caretaking doctrine. Further, the court also rejected the Commonwealth's contention that the court had erred by declining to admit the evidence under the inevitable discovery

doctrine and by denying the Commonwealth's request to supplement the record regarding this claim.

The Commonwealth raises the following issues for appellate review:

1. Whether the court erred when it ruled that the community caretaker doctrine did not justify entry into the home of [Shaw] who was found with his throat slashed, bleeding into a hamper, admitting to having attempted suicide. Did not consider whether the Commonwealth had demonstrated that the items seized from [Shaw], his residence and vehicle would have been inevitably discovered?

2. Whether the court erred when it did not consider whether the Commonwealth had demonstrated that the items seized from [Shaw], his residence and vehicle would have been inevitably discovered[?]

Commonwealth's Br. at 6.

When we review "an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the appellee's witnesses along with the Commonwealth's evidence which remains uncontroverted." *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010). We review the trial court's factual findings to determine whether the record supports them; we review the court's legal conclusions *de novo*. **Id**. Where supported by the record, "a suppression court's findings of fact are binding on this Court." *Commonwealth v. Coughlin*, 199 A.3d 401, 404 (Pa.Super. 2018) (*en banc*) (citations omitted).

In its first issue, the Commonwealth contends that the trial court erred by determining that New Jersey's community-caretaking doctrine did not

excuse the officer's warrantless entry and search of Shaw's apartment. The Commonwealth emphasizes that Officer Wilson entered Shaw's apartment for the sole purpose of checking on his welfare and did not have any knowledge that he was a suspect in the victim's murder. The Commonwealth points out that Officer Wilson in fact saved Shaw's life. Further, while the Commonwealth acknowledges the suppression court's reliance on **State v. Vargas**, 63 A.3d 175 (N.J. 2013), it asserts that the facts of the instant case are more similar to **State v. Mordente**, 133 A.3d 684 (N.J. Super. Ct. App. Div. 2016).

The suppression court in this case applied New Jersey law to this issue because it concluded that New Jersey has a greater interest in the outcome of this question than Pennsylvania does. **See Commonwealth v. Sanchez**, 716 A.2d 1221, 1224 (Pa. 1998) (holding Pennsylvania's choice-of-law interest analysis applies in criminal cases). As neither party here disputes the lower court's application of New Jersey law to this issue, we assume, without deciding, that New Jersey law governs Shaw's first issue.

In **Vargas**, the New Jersey Supreme Court discussed New Jersey's community-caretaking doctrine at length. There, police entered the defendant's home to check on his welfare and found evidence of contraband in the process. The State argued that the warrantless entry was proper pursuant to the community-caretaking doctrine, because the defendant's landlord had had no contact with him for two weeks, his rent and bills were late, his mailbox was full, and his car was covered in dust and had flat tires. 63 A.3d at 178-179.

- 11 -

The **Vargas** court was not convinced. It explained that New Jersey's community-caretaking doctrine applies in strictly limited circumstances. It permits an officer to enter a home without a warrant only if the officer "has an objectively reasonable basis to believe that an emergency requires that [the officer] provide immediate assistance to protect or preserve life, or to prevent serious injury and there is a reasonable nexus between the emergency and the area or places to be searched." **Id**. at 188 (citations and internal quotation marks omitted). The **Vargas** court explained that the police lacked an objectively reasonable basis to believe that immediate entry was necessary due to an immediate risk to the safety of either Vargas or the community. **Id.** at 191. Rather, the court considered Vargas's two-week absence to be "consistent with a person vacationing, traveling on business, or tending to a personal family matter." **Id.**

Conversely, in **Mordente**, the Appellate Division of the New Jersey Superior Court concluded that the circumstances there were sufficient to invoke the community-caretaking doctrine. **Mordente**, 133 A.3d at 688. There, the defendant had alerted police that his elderly mother was missing during a winter night. **Id**. at 687-688. The defendant was extremely worried and feared she might have fallen down some basement steps. The defendant allowed New Jersey officers to enter his home, and then left. Later, officers returned to the home and searched for the defendant's mother, and found unrelated contraband. The appellate court concluded that the trial court properly refused to suppress the contraband, because there was sufficient,

objective evidence that an emergency required immediate assistance to protect human life. *Id*. at 688.

In this case, the suppression court found the instant facts more similar to those presented in *Vargas* than those in *Mordente*, and we agree. The only objective fact in favor of entry into Shaw's apartment, that Officer Wilson knew, was that Shaw had not attended work in two days. Officer Wilson did not see, hear, or smell anything unusual at Shaw's front door. Neither the building superintendent, nor anyone else, told Officer Wilson that Shaw was elderly or infirm, as occurred in *Mordente*. In fact, akin to the *Vargas* court's considering the evidence there to be consistent with a person being away, Officer Wilson noted that Shaw could merely be on vacation or want to be left alone. Therefore, we conclude that the suppression court properly determined that Officer Wilson's warrantless entry into Shaw's apartment did not pass muster under New Jersey's community-caretaking exception. Thus, we hold that the Commonwealth's first issue warrants no relief.

In its second claim, the Commonwealth argues that the suppression court erred by failing to apply the inevitable discovery doctrine to admit the evidence at issue. The Commonwealth contends that Luzerne County police would have inevitably discovered the evidence seized from Shaw's apartment and his car due to the information already in their possession before they learned of the New Jersey officers' search. The Commonwealth points out that Shaw was a primary suspect in a homicide and surveillance video shows him leaving the scene of the crime in his vehicle shortly before the victim's body

was found, and arriving at his own apartment in New Jersey in that vehicle thereafter.

The Commonwealth adds that the victim's uncle, Tracy McCoy, could place Shaw in the area of the victim's apartment at the time of the homicide and represented that the victim and Shaw were involved in a romantic relationship that they were discussing ending. In addition, the Commonwealth notes that cell phone records revealed contact between Shaw and the victim and business records also likewise confirmed that Shaw had used a gym and movie theater near the victim's apartment during the time in question. The Commonwealth maintains that all of this information, together, supplied the Luzerne County police with probable cause to obtain a warrant for Shaw's apartment, and they would have done so, as he was their prime suspect. The Commonwealth argues that when police executed that warrant, they would have inevitably discovered the evidence that the New Jersey police obtained during their search.

The Commonwealth argues that the suppression court thus erred by failing even to consider the inevitable discovery doctrine in its Findings of Fact and Conclusions of Law. The Commonwealth further points out that the court failed to address its request to supplement the record regarding this claim. Thus, the Commonwealth urges this Court to remand this case to the suppression court to provide the Commonwealth with the opportunity to supplement the record and the suppression court with the chance to consider

fully the application of this very fact-specific doctrine to the complex case at hand.

Both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution require governmental searches of a home to be conducted pursuant to a warrant supported by probable cause, unless a warrant exception applies. *See Commonwealth v. Newsome*, 170 A.3d 1151, 1154 (Pa.Super. 2017). Searches that are conducted in violation of this rule are illegal and evidence so discovered is subject to suppression. *See Commonwealth v. Carper*, 172 A.3d 613, 618 (Pa.Super. 2017).

One exception to the warrant requirement is the inevitable discovery doctrine, which excepts from exclusion evidence that police would have inevitably discovered by legal means. *Commonwealth v. Fulton*, 179 A.3d 475, 489-90 (Pa. 2018). In order to invoke this doctrine, the prosecution has the burden of proving by a preponderance of the evidence that police would have inevitably discovered the otherwise excludable evidence, by lawful means. *Id.* at 490. "Police must demonstrate that the evidence would have been discovered absent the police misconduct, not simply that they somehow could have lawfully discovered it." *Commonwealth v. Perel*, 107 A.3d 185, 196 (Pa.Super. 2014) (emphasis removed).

Here, although the suppression court initially failed to address the Commonwealth's inevitable discovery claim, it ultimately found that the facts known to Pennsylvania law enforcement at the relevant time were insufficient

to invoke the doctrine.[4] Suppression Ct. Op., 10/11/19, at 4-5 (unpaginated). The suppression court also properly noted that a court's decision to disallow the opening of the record is subject to review under an abuse of discretion standard. **Commonwealth v. Brown**, 700 A.2d 1310, 1320 (Pa.Super. 1997). Although the court did not initially address the Commonwealth's request to supplement the record, in its Rule 1925(a) opinion, the court opined that the Commonwealth had sufficient opportunity between the time when Shaw filed his suppression motion in December 2018 and the suppression hearing in June 2019, to present any relevant evidence. **Id.** at 5-6. Thus, the suppression court maintains that its failure to address the Commonwealth's request to supplement the record and ultimate denial of such request did not constitute an abuse of discretion. Under the particular facts at issue here, we disagree.

As discussed above, a claim regarding the inevitable discovery doctrine is rooted in a close factual analysis. This case has a complex and sprawling factual landscape – including two distinct law enforcement agencies in two states, potential DNA evidence, surveillance video featuring Shaw, potential testimony of the victim's relative who observed Shaw and the victim interact near the time of the murder – that required a fully developed record. In these circumstances, the failure to grant, let alone address the Commonwealth's

---

[4] The trial court applied Pennsylvania law to this issue and due to our disposition we need not address whether this was the proper course.

request to supplement the record prior to granting the suppression motion seeking to exclude nearly all evidence at issue in this case, was error.

Accordingly, we affirm the suppression court's application of New Jersey's community-caretaking exception. However, we reverse the denial of the Commonwealth's request to supplement the record, vacate the suppression order, and remand for further proceedings consistent with this Memorandum.

Order vacated and remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/1/2020