**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

DOCKET NO. A-1741-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

P.C.,

    Defendant-Appellant.

_____

Submitted January 16, 2018 — Decided  July 9, 2018

Before Judges Ostrer and Whipple.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Indictment No. 14-
10-2429.

Joseph E. Krakora, Public Defender, attorney
for appellant (Theresa Y. Kyles, Assistant
Deputy Public Defender, of counsel and on the
brief).

Gurbir S. Grewal, Attorney General, attorney
for respondent (Emily R. Anderson, Deputy
Attorney General, of counsel and on the
brief).

PER CURIAM

Defendant P.C.[1] appeals from a November 9, 2015 judgment of conviction following the entry of a guilty plea to weapons possession. In particular, defendant argues the trial court's denial of his motion to suppress evidence found after police searched his living areas was error. Having reviewed defendant's arguments in light of the record and applicable legal principles, we affirm.

We discern the following relevant facts from police testimony elicited at the motion to suppress. On April 22, 2014, at around 6:30 p.m., a Maplewood police sergeant and several officers responded to defendant's house in Maplewood. Earlier that day, due to concerns about his mental health, defendant was transported by police to East Orange General Hospital for crisis intervention. Soon after, the police received complaints from a family member that defendant possessed a firearm and had sent text messages threatening to hurt people.[2] The sergeant testified the police "received a call from one of them and he was concerned about the safety of his family and of the community[.]"

---

[1] Because the facts of this case involve issues regarding defendant's mental health, we use initials to protect his privacy.

[2] For example, the following message was among those provided to police: "I can't take it anymore. If there's a murder, don't fucking be surprised, I'm doing my best but these bitches are killing me."

The sergeant arrived at defendant's house and was met at the door by defendant's aunt and grandfather. After they spoke at the door for a while, "the family let [him] in and . . . all agreed it was best to get the gun out of the house." The police asked the family for permission to search for the gun, and while the aunt was nervous, the grandfather gave permission for the search. The grandfather represented he was the homeowner, and he lived in the home with the aunt and defendant. At some point during the police presence in the home, a third family member arrived, and "was kind of aggravated and wanted [the police] to do something[.]"

The sergeant went upstairs with the aunt and the grandfather to conduct the search. There were three bedrooms located upstairs, along with a second kitchen, through which defendant's bedroom was located. When the sergeant got to the top of the stairs he could see into the kitchen and another room behind that, a bedroom. According to the sergeant the kitchen was "in shambles" with knives sticking in the walls and holes in the walls. The family directed the sergeant to defendant's bedroom, where he observed a book about improvised explosive devices, as well as knives and other weapons including an Airsoft, replica weapons that looked like real guns, brass knuckles, throwing knives, samurai swords, fake hand grenades, a Taser gun, and bulletproof vests.

A-1741-15T1

The sergeant called for an additional police unit. None of the family objected, and the aunt and the grandfather expressed agreement that the various implements should be removed from the house. The family assisted police in gathering things.

Additionally, the grandfather informed the police he owned a shotgun, which defendant possessed. The shotgun was located, with ammunition, in a locked gun safe in the upstairs kitchen. The grandfather provided police with the keys. The shotgun had been altered in an illegal fashion.

In October 2014, an Essex County Grand Jury returned an indictment charging defendant with third-degree possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b); fourth-degree possession of a stun gun, N.J.S.A. 2C:39-3(h); fourth-degree possession of a weapon (two pairs of brass knuckles) under circumstances not manifestly appropriate for lawful use, N.J.S.A. 2C:39-5(d); and fourth-degree possession of a gravity knife without an explainable lawful purpose, N.J.S.A. 2C:39-3(e). Defendant moved to suppress the seized items.

Over several days in June 2015, the court conducted a hearing on defendant's motion to suppress. At the motion hearing, the state offered the sergeant's testimony as outlined above. The aunt offered a different version of events. She stated, "[the police] rang the doorbell and I asked what they wanted . . . I

4

forgot what they said and I asked for a search warrant. They did not show me nothing. And they just ran upstairs." She testified the officers did not ask for consent to search the house, did not show her a warrant, told her to remain downstairs, did not allow her upstairs, and ransacked the upstairs of the home, breaking things.

Defendant lived in the upstairs bedroom, and the aunt initially stated defendant paid rent and was the sole user of the upstairs kitchen and the attached bedroom, but the occupants of the home had to walk past the kitchen to get downstairs, and would enter the area every so often.

The grandfather testified that when the police came to the house on the day in question, they "came through the front door straight up, straight in." They did not ask for consent to search the home, and did not give him any forms to sign. He said he followed the police upstairs and was told to go back downstairs.

The grandfather testified defendant paid rent, and lived upstairs in an area that was not open to everyone else in the home but he would go upstairs into defendant's living area sometimes to visit. The gun located in the safe belonged to him, and he testified he did not provide police with the key. He denied a third family member was present in the home during the search,

asserted he did not ask the police to remove any items, and did not know these items were present in his home.

The trial judge denied defendant's motion to suppress. He found the sergeant to be a credible witness. In contrast, the judge found the testimony of the aunt and the grandfather not credible. The trial judge noted their stories were aligned with one another's, how they were largely different than the sergeant's, and were biased by not wanting defendant to get in more trouble than he already was. He found it illogical that the sergeant ignored the aunt's questions and went into this private home without a warrant and the police just did what they felt they needed to do. The judge stated,

> there was a valid exception here to the warrant requirement that the police . . . were performing an important community caretaking responsibility . . . by removing the weapons in the home for the protection of the . . . family . . . the urgency was that there was no telling when [defendant] was gonna be returning[.]

Further, the judge made findings on the issue of consent. He stated, "there was no evidence [the sergeant] advised the family . . . that they had a right to refuse." However, "consent was not affected by the failure of the police to specifically inform the person that they had a right to refuse consent or inspection,

where there was no indication that he would have declined [to consent] had he been informed of that right."

On September 25, 2015, defendant pled guilty to all four charges of the indictment. In return for the plea, the State downgraded the third-degree possession of the sawed-off shotgun to a fourth-degree regulatory violation of N.J.S.A. 2C:39-10(a). The State recommended a sentence of non-custodial probation conditioned upon the defendant's continued participation in mental health counseling, alcohol counseling, random drug testing, and maintained employment.

On November 9, 2015, the judge sentenced defendant in accordance with the plea agreement, finding mitigating factor ten, and aggravating factor nine, and that these were in equipoise. On each count, defendant was sentenced to a three-year probationary term, running concurrently, conditioned upon him maintaining employment, continuing with mental health counseling, continuing with AA meetings, forfeiting all weapons seized, performing seventy-five hours of community service, and submitting to drug and alcohol testing. Appropriate fines and penalties were assessed.

This appeal followed. On appeal, defendant raises the following issues:

POINT I. THE COURT ERRED IN HOLDING THAT THE WARRANTLESS SEARCH OF [P.C.'s] ROOMS FELL WITHIN THE COMMUNITY-CARETAKING AND CONSENT-TO-SEARCH EXCEPTIONS TO THE WARRANT REQUIREMENT.

A. THE COMMUNITY CARETAKING DOCTRINE, WHICH IS SUBSUMED WITHIN THE EMERGENCY-AID DOCTRINE, DID NOT JUSTIFY THE ENTRY INTO AND SEARCH OF [P.C.'s] ROOMS.

B. THE CONSENT-TO-SEARCH EXCEPTION TO THE WARRANT REQUIREMENT DID NOT APPLY TO THE ENTRY INTO AND SEARCH OF [P.C.'s] ROOMS WHERE NEITHER HIS GRANDFATHER NOR HIS AUNT HAD ACTUAL OR APPARENT AUTHORITY TO CONSENT TO A SEARCH OF THAT AREA.

I.

When we review a grant or denial of a motion to suppress we defer to the factual findings of the trial court if those findings are supported by sufficient evidence in the record. State v. Hubbard, 222 N.J. 249, 262 (2015) (citation omitted). We defer to a trial judge's factual findings because these findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999) (citations omitted). These factual findings should only be disturbed if they are "so clearly mistaken that the interests of justice demand intervention and correction." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)); Hubbard, 222 N.J. at 262. This applies as well to

8

credibility findings by the trial judge. Locurto, 157 N.J. at 470; State v. Barone, 147 N.J. 599, 615 (1998). However, the trial court's legal interpretations will be reviewed de novo. Hubbard, 222 N.J. at 263.

The United States and New Jersey Constitution protect individuals against unreasonable searches and seizures. U.S. Const., amend IV; N.J. Const., art. I, ¶ 7. "Warrantless seizures and searches are presumptively invalid as contrary to the United States and the New Jersey Constitutions." State v. Pineiro, 181 N.J. 13, 19 (2004) (citation omitted).

To overcome this presumption, the State must show the search falls within one of the well-recognized exceptions to the warrant requirement. State v. Maryland, 167 N.J. 471, 482 (2001) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). The community-caretaking doctrine is such an exception when animated by exigent circumstances. State v. Edmonds, 211 N.J. 117, 141 (2012) (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). Consent is another. Bustamonte, 412 U.S. at 219; State v. Lamb, 218 N.J. 300, 315 (2014).

## II.

Defendant argues the trial court's reliance on the community-caretaking doctrine was in error, as this doctrine has been subsumed within the emergency-aid doctrine. He asserts there was

no genuine and imminent danger to the safety or welfare of another to justify the warrantless search under this exception.

Under the community-caretaking doctrine, police act "not in their law enforcement or criminal investigatory role," but rather in "a wide range of social services, such as aiding those in danger of harm, preserving property, and creat[ing] and maintain[ing] a feeling of security in the community." State v. Bogan, 200 N.J. 61, 73 (2009) (citations omitted); Edmonds, 211 N.J. at 141. Our Supreme Court has held that the community-caretaking doctrine, standing alone and without additional exigency or consent, is insufficient to allow a warrantless search of a home. State v. Wright, 221 N.J. 456, 468 (2015) (citing State v. Vargas, 213 N.J. 301, 325 (2013)). Thus the community-caretaking doctrine has merged, to some extent, with the emergency-aid doctrine. See State v. Mordente, 444 N.J. Super. 393, 397-98 (2016).

Under the emergency-aid doctrine, a warrantless search is permitted when two requirements are met: (1) the existence of an emergency, viewed objectively; and (2) "a reasonable nexus between the search and the emergency." Edmonds, 211 N.J. at 132 (quoting State v. Frankel, 179 N.J. 586, 600 (2004)).

Under the first element, "the test is whether the evidence would have led a 'prudent and reasonable officer' to perceive an immediate need to take action in order to prevent death or to

protect against serious injury to persons or property." State v. Cassidy, 179 N.J. 150, 163 (2004) (quoting 3 Wayne LaFave, Search & Seizure § 6.6(a) at 391 (1996)).  The officer must only possess "an objectively reasonable basis to believe--not certitude--that there is a danger and need for prompt action."  Frankel, 179 N.J. at 599 (citing Cassidy, 179 N.J. at 161).  The actual non-existence of the perceived danger "does not invalidate the reasonableness of the decision to act at the time."  Ibid.

Here, earlier on April 22, 2014, the police transferred defendant to the hospital under a psychological watch, because the police and his family "felt he was a danger to himself and others." Subsequently, the police received "several texts and emails from family members . . . [defendant] was sending out about hurting himself and hurting . . . other people."  They also received a phone call believed to be from a family member who was concerned about the safety of defendant's family and the community.  Through these interactions, the police formed the belief defendant owned weapons.

Based on this information, the police responded to defendant's home.  The sergeant testified "based on the totality of the circumstances, . . . having seen the emails sent by [defendant] to the family members.  Knowing the condition he was in . . . truly felt [defendant] was a danger to the community."

11

The sergeant noted, "the house [was] literally 100 feet from a school yard", adding to the urgency of the circumstances. Because the sergeant did not know when defendant would be able to leave the hospital and return to the home, he felt it was necessary for the safety of the public to remove the weapons immediately.

The trial judge found the sergeant was a credible witness, and we defer to the judge's credibility determinations. Locurto, 157 N.J. at 470. The police formed an objectively reasonable perception there was an immediate danger defendant could return home from the hospital, take the alleged weapons, and hurt himself, someone in his family, or someone in the community. Whether or not defendant was in fact about to arrive at the home at any minute is irrelevant, as long as the police objectively believed it was so. See Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) ("[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person.")

Next, "the scope of the search under the emergency aid exception is limited to the reasons and objectives that prompted the search in the first place." Frankel, 179 N.J. at 599 (2004) (citing Terry v. Ohio, 392 U.S. 1, 19-20 (1968)). Here, the only places searched by police were those belonging to defendant. They searched his kitchenette and his bedroom, and did not intrude into

other bedrooms or living areas in the home, nor into places where a gun could not reasonably be found. Thus, there was a reasonable nexus between the search and the perceived emergency.

Based on the foregoing, and in particular the credibility findings, we can find no basis to say that the trial judge abused his discretion in determining that the community-caretaking doctrine applied to permit the warrantless search.

### III.

Defendant further argues that the trial judge erred by finding that the warrantless search permissible due to the consent given by the grandfather and the aunt, because the consent was not valid. Alternatively, he argues that the grandfather and the aunt did not have actual or apparent authority to consent to the search of defendant's living areas.

"[A]ny consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." State v. Carty, 170 N.J. 632, 639 (2002); State v. Elders, 192 N.J. 224, 236 (2007); State v. Domicz, 188 N.J. 285, 307 (2006). In order for consent to a warrantless search to be voluntary, the State must show that the person involved knew he or she "had a choice in the matter." State v. Johnson, 68 N.J. 349, 354 (1975). However, the State does not need to prove that the person was informed of his or her right to refuse consent.

Ibid.; State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985). Therefore, the question is whether the consent was "the result of duress or coercion, express or implied." Lamb, 218 N.J. at 315 (citations omitted).

The sergeant was at the home at the behest of defendant's family, he identified himself as police, and was invited inside. While in the home, the sergeant asked the family for permission to search for the weapons he perceived to be in the home. The aunt and the grandfather granted their permission, and even walked upstairs with the sergeant to assist in the search. While it is undisputed the sergeant did not affirmatively inform the aunt and the grandfather they could refuse consent, under the totality of the circumstances, there is no indication that they would have refused had he done so. See State v. Brown, 282 N.J. Super. 538, 548 (App. Div. 1995). The circumstances present here do not demonstrate the consent was the result of duress or coercion, and we find no basis to conclude the judge's finding that the sergeant obtained valid consent from the family was in error or an abuse of discretion.

Valid consent to search "may be obtained from one other than the accused . . . so long as the consenting third party has the authority to bind the accused." Douglas, 204 N.J. Super. at 276; State v. Suazo, 133 N.J. 315, 320 (1993).

14

"A co-habitant who possesses common authority over or has a sufficient relationship to the premises or effects sought to be inspected may voluntarily consent to a lawful search." Lamb, 218 N.J. at 315 (citing United States v. Matlock, 415 U.S. 164, 171 (1974)). These third parties may have actual authority to consent "based on their common use of the space searched." State v. Cushing, 226 N.J. 187, 200 (2016) (citing Suazo, 133 N.J. at 319-20).

Here, the grandfather gave third-party consent to the search by the police. Most importantly, he informed the police he was the homeowner, and explicitly gave the sergeant permission to search the kitchenette and bedroom utilized by defendant. The sergeant testified his view into the kitchenette and the bedroom was unobstructed. Additionally, both the aunt and the grandfather spent time in defendant's living areas, and defendant would often use the downstairs kitchen with them. Furthermore, since the grandfather testified the gun safe was his, and the shotgun inside was his for hunting, the consent given to search the safe does not need to satisfy the third-party test.

Based on the sergeant's credible testimony, the grandfather, as homeowner with both common authority and sufficient relationship to the premises to be searched, had actual authority to consent to a search of the rooms and the gun safe.

15

Moreover, even if the grandfather did not have actual authority to consent, he had apparent authority. Apparent authority "arises when a third party (1) does not possess actual authority to consent but appears to have such authority and (2) the law enforcement officer reasonably relied, from an objective perspective, on that appearance of authority." Cushing, 226 N.J. at 199-200 (citing Ill. v. Rodriquez, 497 U.S. 177, 185-89 (1990)). "The question is 'whether the officer's belief that the third party had the authority to consent was objectively reasonable in view of the facts and circumstances known at the time of the search.'" State v. Coles, 218 N.J. 322, 340 (2014) (quoting Suazo, 133 N.J. at 320). The sergeant learned at the scene that the grandfather was the homeowner, who readily agreed to permit him to conduct a search.

In light of the facts and circumstances known at the time of the search, the sergeant's belief the grandfather had actual authority to consent to the search was objectively reasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1741-15T1